ILLINOIS COMMERCE COMMISSION and Patrick W. Simmons, Petitioners,

v.

INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,

Association of American Railroads, Rails to Trails Conservancy, and Iowa Trails Council, Intervenors.

COMMISSIONER OF TRANSPORTATION OF the STATE OF NEW YORK, Petitioner,

v.

INTERSTATE COMMERCE COMMISSION and United States of America, Respondents.

RAILS TO TRAILS CONSERVANCY, IOWA TRAILS COUNCIL, and Conservation Federation of Maryland, Petitioners,

v.

INTERSTATE COMMERCE COMMISSION and United States of America, Respondents.

Nos. 86–1687, 87–1015, 87–1278.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 25, 1988.

Decided May 24, 1988.

As Amended May 24, 1988.

Gordon P. MacDougall, Washington, D.C., with whom James E. Weging, Sp. Asst. Atty. Gen., Chicago, Ill., were on the brief for petitioners Illinois Commerce Com'n and Patrick W. Simmons in No. 87–1687.

William J. Dwyer, Albany, N.Y., for petitioner Com'r of Transp. of the State of N.Y. in No. 87–1015.

Charles H. Montange, Washington, D.C., for petitioners Rail to Trails Conservancy, Iowa Trails Council, and Conservation Federation of Maryland in No. 87–1278.

Louis Mackall, Atty., ICC, with whom Robert S. Burke, General Counsel, Ellen D. Hanson, Associate Gen. Counsel, Anne S. Almy, Asst. Chief, Land and Natural Resources Div., Dept. of Justice, and J. Carol Williams, Atty., Dept. of Justice, Washington, D.C., were on the joint brief for Respondents the ICC and the U.S.

John T. Sullivan and J. Thomas Tidd, Washington, D.C., were on the brief for intervenor, Ass'n of American Railroads.

Before MIKVA, STARR and SILBERMAN, Circuit Judges.

Opinion for the Court PER CURIAM.

Opinion concurring in part and dissenting in part filed by Circuit Judge MIKVA.

PER CURIAM:

This case is before us a second time following a remand to the Interstate Commerce Commission. The controversy relates to the ICC's relaxation of regulatory strictures triggered by a railroad's proposed abandonment of rail lines that have fallen into a state of rail-traffic desuetude. In our prior consideration, we concluded that the ICC's order establishing a class exemption for abandonments was, in certain respects, deficient under the applicable standards of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (1982). Specifically, we concluded that in three particulars the Commission failed adequately either to address salient points adumbrated in comments submitted to the ICC or to marshall the requisite factual support for the conclusions undergirding the Commission's final rule.

The question now before us is whether the ICC complied on remand with both the APA's strictures and the specific requirements previously articulated by this court. In addition, an entirely new set of questions arose during the course of the proceedings on remand, namely, whether the ICC's actions comply with various federal environmental statutes. For the reasons that follow, we uphold the Commission's decision.

I

The order in question involves an expedited method of effecting abandonment of "out of service" rail lines,[1] which are defined as those carrying no local traffic for at least two years. The Commission promulgated the regulation, 49 C.F.R. § 1152.50 (1985), pursuant to the deregulatory mandate of the Staggers Rail Act of 1980,[2]

1. The exemption also extends to discontinuances of service and trackage rights under 49 U.S.C. § 10903–05 (1982). *Exemption of Out of Service Rail Lines*, 2 I.C.C.2d 146 (1986).

2. The legislative history of the Staggers Rail Act of 1980, Pub.L. No. 96–448, 94 Stat. 1895 (1980),

clearly evinces Congress' desire to deregulate the railroads. In enacting section 10505 and conferring broad exemption authority on the ICC, Congress expected that "as many as possible of the Commission's restrictions on changes in prices and services by rail carriers will be removed [through the use of section 10505] and

specifically section 10505. 49 U.S.C. § 10505 (1982). Section 10505 requires the ICC to exempt a transaction or class of transactions from regulation when the Commission finds that (1) regulation is not necessary to carry out the multi-faceted national rail transportation policy (RTP), as set forth in 49 U.S.C. § 10101a; and (2) either (a) the transaction is of limited scope, or (b) regulation is not needed to protect shippers from the abuse of market power. *Id.* § 10505(a). The statutory and procedural background of the rulemaking is thoroughly chronicled in our previous opinion, the upshot of which was to dispatch the rulemaking back to the Commission for further consideration and explanation. *Illinois Commerce Comm'n v. ICC,* 787 F.2d 616 (D.C.Cir.1986).

In directing a remand, our colleagues faulted the Commission's order in several respects. First, the ICC had failed adequately to consider whether the abandonment regulations from which it was exempting eligible rail lines were necessary to effectuate relevant goals of the RTP, specifically: (1) energy conservation, (2) maintenance of reasonable rates, (3) meeting the needs of the national defense, and (4) cooperation with States in respect of transportation matters. *Id.* at 629–32.[3] Second, the Commission had neglected to assess the adequacy of its findings concerning the limited scope of the exemption and the potential for abuse of market power, in light of the expanded definition of "out of service" adopted in the final rule. *Id.* at 634–35. The originally proposed definition of "out of service," which encompassed only rail lines carrying no traffic at

all for at least two years, had been expanded in the final rule to include lines carrying overhead traffic, *i.e.,* traffic that neither originates nor terminates on a line and can be rerouted over other lines. *Id.* at 634. Finally, the original regulation had specified no clear procedure for challenging the sufficiency of employee protections automatically provided under the exemption. *Id.* at 636.

On remand, the ICC readopted the class exemption for "out of service" lines, but elaborated on the points found wanting in our prior opinion. *Exemption of Out of Service Rail Lines,* 2 I.C.C.2d 146 (1986). Unenamored of this result, the Illinois Commerce Commission and Patrick Simmons (Illinois) filed a petition with the ICC requesting a stay of the decision's effective date pending appeal. Expanding the already broad horizons of the proceeding, Rails to Trails Conservancy (RTC), joined by two other nonprofit organizations,[4] entered the fray for the first time by petitioning the ICC for reconsideration and a stay of its decision. Ex Parte No. 274 (Sub–No. 8) *Exemption of Out of Service Rail Lines,* (not printed) decided June 15, 1987. RTC argued, first, that the rulemaking constituted a major federal action triggering the requirements of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332 (1982), with which the Commission had failed to comply; second, that the exemption requirements failed to assure compliance with a number of applicable environmental statutes, including NEPA and the National Historic Preservation Act (NHPA), 16 U.S.C. § 470f (1982); and, finally, that the ICC failed adequately to

---

that the Commission will adopt a policy of reviewing carrier actions after the fact to correct abuses of market power." H.Con.Rep. No. 1430, 96th Cong., 2d Sess. 105, *reprinted in* 1980 U.S.Code Cong. & Admin.News 3978, 4110, 4137. Congress believed that "the Commission is more capable through the administrative process of examining specific regulatory provisions and practices not yet addressed by Congress to determine where they can be deregulated consistent with the policies of Congress." *Id.; see also Illinois Commerce Comm'n v. ICC,* 749 F.2d 875, 885 (D.C.Cir.1984) (deregulation through exemption process overriding purpose of Act), *cert. denied,* 474 U.S. 820, 106 S.Ct. 70, 88 L.Ed. 2d 57 (1985); *Coal Exporters Ass'n v. United*

*States,* 745 F.2d 76, 82 (D.C.Cir.1984) (exemption provision intended to give ICC very broad authority to eliminate unnecessary regulation), *cert. denied,* 471 U.S. 1072, 105 S.Ct. 2151, 85 L.Ed.2d 507 (1985).

**3.** For the reader's reference, the multi-pronged RTP is quoted in full at footnote 67 in our prior opinion. *Illinois Commerce Comm'n,* 787 F.2d at 626 n. 67.

**4.** Iowa Trails Council and Conservation Federation of Maryland joined RTC in the agency proceedings and now on review.

consider the effect of the regulations on public use of abandoned lines under the National Trails System Act, 16 U.S.C. § 1247 (1982), and the public use provision of the Interstate Commerce Act, 49 U.S.C. § 10906 (1982). *Id.* The Commission denied all the petitions, and these petitions for review followed.[5]

## II

### A

In our earlier decision, the first area of concern articulated by our colleagues related to the ICC's treatment of the RTP or, more specifically, the agency's examination of the five RTP goals listed above. *See* 49 U.S.C. § 10505(a)(1). Now, after reviewing the agency's analysis on remand of each of these five factors, we are persuaded that the Commission's conclusion (that application of the abandonment regulations to "out of service" lines is not necessary to carry out the RTP) is neither arbitrary nor capricious; to the contrary, the Commission's analysis is reasonable and adequately supported by the record. *Cf. Illinois Commerce Comm'n v. ICC*, 819 F.2d 311, 317 (D.C.Cir.1987) (applying "arbitrary and capricious" standard to trackage rights agreements); *Brae Corp. v. ICC*, 740 F.2d 1023, 1038 (D.C.Cir.1984), *cert. denied*, 471 U.S. 1069, 105 S.Ct. 2149, 85 L.Ed.2d 505 (1985) ("arbitrary and capricious" review of exemption of boxcar freight rates from regulation).

■ In our prior consideration of this case, the court faulted the agency's finding that exemption would promote energy conservation, 49 U.S.C. § 10101a(15), as being "utterly lacking in record support." *Illinois Commerce Comm'n*, 787 F.2d at 629. On remand, the agency modified this particular determination, concluding "upon

further reflection ... that energy conservation is unlikely to be affected in any significant way." *Out of Service*, 2 I.C.C. 2d at 148. In arriving at this latter, more modest conclusion, the Commission reasoned as follows: where a line has carried no traffic at all, abandonment will have no effect on energy consumption since there is no traffic to be cut off or diverted to other routes or modes of transportation. Although abandonment of a line that has carried overhead traffic may result in some increase (or decrease) in fuel consumption due to rerouting, any such change, the ICC reasoned, should be insignificant since it is in the carrier's interest to maintain the most efficient routes and to aggregate traffic in order to minimize energy costs. *Id.*

Illinois attempts to derail this line of reasoning by arguing that even if carriers operate efficiently, they will nonetheless reroute traffic in ways that save costs elsewhere in their operations, but not necessarily in a manner that conserves energy. Brief for Illinois at 13. Illinois further contends that rerouting traffic may involve much more than a minimal increase in fuel consumption. *Id.* Illinois cites nothing, however, in support of either of these speculative assertions. Nor do petitioners point to anything indicating that application of the abandonment regulations is, as the statute contemplates, *necessary* to the promotion and encouragement of energy conservation. In contrast to petitioners' creative exercise in the realm of the hypothetical, the ICC's analysis logically and persuasively explains why the agency believes the effect on energy matters will be *de minimis;*[6] in the absence of an indication that the agency's judgment is flawed, we are persuaded that the explanation is am-

---

5. Separate petitions for review were filed by the Illinois Commerce Commission and Patrick Simmons; the Commissioner of Transportation of the State of New York; and Rails to Trails Conservancy, Iowa Trails Council, and Conservation Federation of Maryland. The petitions were consolidated by the court.

6. In its decision, the Commission observed that in situations where overhead traffic is not being

rerouted efficiently (which presumably would include cases where rerouting has resulted in more than a *de minimis* increase in energy consumption), an affected shipper may file a petition for reconsideration challenging the carrier's representation that all overhead traffic can be rerouted in an efficient manner. *Out of Service*, 2 I.C.C.2d at 151.

ply reasoned to pass muster under the APA.

### B

■ The second RTP-related concern which had been inadequately addressed in the ICC's earlier decision involved the effect of the class exemption on rate reasonableness. In the court's view, the ICC had failed to consider whether abandonment of "out of service" lines will expose shippers to excessive rates in circumstances where there is a want of competition. *Illinois Commerce Comm'n*, 787 F.2d at 630.[7]

Upon reexamination of this point, the Commission concluded that the class exemption will not affect the agency's ability to assure the reasonableness of rates. *Out of Service*, 2 I.C.C.2d at 148. In so concluding, the ICC observed that exemption will not in any way alter the Commission's authority to regulate rates nor will it provide carriers with an opportunity to initiate previously forbidden rate actions. With or without an exemption for abandonments of "out of service" lines, the ICC emphasized, carriers are at liberty to set rates at levels of their choosing, subject to protest by shippers. *Id.* at 149.[8] Nothing in the exemption works a change to this carefully crafted scheme.

Illinois attacks the Commission's finding as to rate reasonableness on several fronts, only two of which merit discussion. Illinois contends, first, that the exemption will have an adverse effect on rates because the abandoned lines would no longer be available for constructing more favorable rates in what is known as "short line rate-making." Brief for Illinois at 15.[9] But this argument, on reflection, largely ignores the process by which rates are established. "Short line ratemaking" is completely voluntary; carriers may terminate the use of a particular "short line" rate at any time, regardless of whether the line has been abandoned and, if it has been abandoned, regardless of whether abandonment was effected pursuant to the statutory or exemption abandonment procedures. Conversely, carriers may maintain a favorable rate, based on an abandoned line, simply by filing a tariff to that effect. *Out of Service*, 2 I.C.C.2d at 149. In short, the abbreviated abandonment procedures have little if anything to do with a carrier's ability, obligation, or incentive to continue offering a particular rate.

Next, Illinois questions the ICC's reliance on its authority to regulate rates as sufficient to prevent carriers' imposing unreasonable rates following on the heels of an abandonment, asserting that a rate can be "unreasonable" yet lawful and thus beyond the ICC's rate-regulatory reach. Brief for Illinois at 17–19. Illinois cites no authority for this proposition, however.[10] This should come as no surprise. The ICC is empowered to regulate any unreasonable

---

7. In discussing rate reasonableness, the court focused on subsection 6 of the RTP, which directs the ICC "to maintain reasonable rates where there is an absence of effective competition...." 49 U.S.C. § 10101a(6). In its petition for review, Illinois points to several other RTP factors which relate to rate reasonableness, including sections 10101a(1), (3), (4), (10), (11), and (13). Brief for Illinois at 14.

8. Section 10701a provides that "unless a rate is prohibited by a provision of this title, a rail carrier ... may establish any rate for transportation or other service provided by the carrier." 49 U.S.C. § 10701a(a). Carriers establish rates for particular lines in tariffs, which they are required to file and maintain. Tariffs are subject to protest (for changed rates) and complaint (for existing rates) procedures. Rates established by carriers with market dominance are subject to challenge on the ground that they exceed a maximum reasonable level. *Id.*

§ 10709. Where there is competition, no such challenge is permitted since competition serves to assure the reasonableness of rates.

9. "Short line ratemaking" is a practice employed by some carriers to allow shippers to take advantage of a lower rate that applies over a route other than the actual route of movement. *Out of Service*, 2 I.C.C.2d at 149 n. 7.

10. Illinois does cite two cases in support of its assertion that rates can be unreasonable, yet lawful and beyond the ICC's power to regulate. Brief for Illinois at 19 n. 22. Neither decision, however, stands for this proposition. Rather, they establish that the ICC may not find a rate unreasonable unless it has established market dominance. *Atchison, T. & S.F. Ry. v. ICC,* 580 F.2d 623, 627 (D.C.Cir.1978); *Potomac Elec. Power Co. v. United States,* 584 F.2d 1058, 1066 (D.C.Cir.1978).

rate charged by a carrier with market dominance. 49 U.S.C. § 10709. In the absence of such dominance, however, the statute assumes that competition in the marketplace will, as it were, "regulate" rates; all rates outside a market-dominant setting are presumed to be reasonable (and thus lawful). The ICC is without power, either with or without the exemption for "out of service" lines, to alter lawful rate increases.

In sum, Illinois' attempts to demonstrate that the statutory abandonment procedures are necessary to ensure rate reasonableness are unavailing. The Commission's determination that the exemption does not affect the rate reasonableness policies of section 10101a, undergirded as it is by a reasoned explanation, readily withstands APA scrutiny.

### C

■ In our previous decision, the court condemned the agency's treatment of a third RTP goal, namely developing a sound rail transportation system to meet the needs of the national defense, 49 U.S.C. § 10101a(4), as inadequate by virtue of the Commission's failure to respond to comments submitted by the Department of Defense. *Illinois Commerce Comm'n,* 787 F.2d at 630–31. Illinois asserts that the Commission on remand once again failed to do its job in this respect. Brief for Illinois at 29–30. The two main points flagged by DOD in its comments back in 1982 were, first, that advance notice of abandonments is essential to safeguard the national defense and, second, that the financial assist-

ance procedures available in the statutory abandonment provisions (designed to provide for the rescue of about-to-be-abandoned lines) should be made available under the exemption. *Illinois Commerce Comm'n,* 787 F.2d at 630 n. 102.[11] Both concerns, we are satisfied, received adequate consideration on remand.

For one thing, the ICC effectively mooted DOD's earlier comments on the financial assistance program since the agency promulgated rules specifically providing for application of those provisions in exemption cases. *See* Ex Parte No. 274 (Sub–No. 16) *Exemption of Rail Line Abandonments or Discontinuance—Offers of Financial Assistance,* decided Dec. 14, 1987. As to DOD's concern over the adequacy of impending abandonments, the Commission observed that, in a separate proceeding,[12] it had in fact extended the period for notice provided to the Defense Department. *Out of Service,* 2 I.C.C. at 151. Railroads invoking the class exemption are now required to notify DOD in writing at least ten days prior to the filing of a notice of exemption with the ICC, thereby according the Department at least sixty days' notice before the abandonment's effective date. 49 C.F.R. § 1152.50(d). The Commission determined that, although this provides less notice than DOD had originally requested,[13] the sixty-day period should afford ample time to identify lines that should be preserved by virtue of national defense considerations.

Illinois' sole criticism of this analysis is that "[t]he System Diagram Map require-

**11.** The financial assistance procedures, 49 U.S.C. § 10905, permit DOD (or any other interested party) either to purchase the line or subsidize its operations as a means of avoiding abandonment or discontinuance.

**12.** *Exemption of Out of Service Rail Lines—Notice to the Department of Defense,* 1 I.C.C.2d 323 (1985).

**13.** In its comments, DOD had suggested that adequate notice would be provided by identification of targeted lines on a carrier's System Diagram Map for at least four months prior to abandonment, as required under the statutory abandonment procedures. *Illinois Commerce Comm'n,* 787 F.2d at 630 n. 102. Under the

statute, railroads are required to maintain complete diagrams of their transportation systems and must indicate lines projected for abandonment or potentially subject to abandonment. 49 U.S.C. § 10904(e)(2). When an abandonment is opposed by a State (or political subdivision) or a significant user of the line during the previous twelve months, a certificate of abandonment ordinarily will not issue unless the line was described in the diagram or an amendment to the diagram at least four months prior to the application. *Id.* § 10904(e)(3). The ICC's failure to incorporate this requirement into the exemption procedures is addressed more fully in the text which follows.

ment ... is the critical notice period." Brief for Illinois at 30. The System Diagram Map, which is part of the statutory abandonment scheme, provides interested parties with four months' notice of potential or proposed abandonments. *See supra* note 13. Illinois neglects to explain why this four-month period, while obviously helpful, is critical or why, if additional time is necessary to meet the Nation's defense needs, DOD failed to reiterate its concern by petitioning for review. Although additional notice would presumably be helpful from DOD's standpoint, Illinois provides us with nothing to indicate that additional time beyond the sixty-day period is in any way *necessary* to DOD's evaluation of proposed abandonments. In the absence of evidence to the contrary, we are satisfied as to the reasonableness of the agency's determination that sixty days' notice is adequate.

### D

■ A related issue which was remanded for further consideration involved the RTP goal of cooperation with the States in transportation matters, 49 U.S.C. § 10101a(9). *Illinois Commerce Comm'n,* 787 F.2d at 631. In our previous decision, the court faulted the ICC's failure to consider comments submitted by States protesting the lack of notice of proposed abandonments under the class exemption. *Id.*[14] Basically, the States contended that retention of the System Diagram Map, or its equivalent, is necessary both to the States' rail planning efforts and to provide notice to rail users who might oppose the abandonment. *Id.* Illinois and New York continue to press that point before us. Brief for Illinois at 30–31; Brief for New York at 7–8. On remand, the Commission considered and rejected these contentions, providing a thorough and well-reasoned explanation for doing so. We turn, then, to the Commission's explanation.

Although rejecting the argument that the statutory abandonment procedures, specifically System Diagram Maps, are necessary to further the goals of the RTP, the Commission squarely responded to the position that notice should be afforded prior to consummation of an abandonment. Under the exemption procedures, States receive notice at least sixty days before the exemption is effective and an abandonment can occur. 49 C.F.R. § 1152.50(d). In justifying the adequacy of the sixty-day period, the Commission observed that the exemption, which by definition applies solely to lines that have generated no traffic for at least two years and carry only overhead traffic that can be rerouted (and thus readily accommodated), results in no loss of service to shippers. *Out of Service,* 2 I.C. C.2d at 154–55. Furthermore, the transactions encompassed by the exemption tend to be noncontroversial, as evidenced by the small number of abandonments generating opposition under the exemption (only 10 of the first 200 cases). *See id.* at 150. In light of this factual predicate, the Commission concluded that the benefits of the additional notice accruing to the small number of States and shippers affected by abandonments of out-of-service lines are outweighed by the costs to railroads both in maintaining the Maps and in delaying desired abandonments for four months. *Id.* at 154.

The ICC's reliance on the sufficiency of the sixty-day notice period did not rest on this balancing alone, however. The Commission considered the situations of various parties who might potentially be affected or involved in rail planning and explained why the notice provided by the System Diagram Maps is unnecessary to protect the interests of such groups. For example, if, in spite of the absence of local traffic, a particular line is important to the State's rail system, the State should monitor its activity, as lack of use will tend to herald

---

14. The court also criticized the Commission's failure to maintain the financial assistance procedures as requested by the States. *Illinois Commerce Comm'n,* 787 F.2d at 631. As noted in our discussion of national defense needs, the ICC has since promulgated rules making the requested procedures automatically available in exemption proceedings, thereby fully satisfying the States' concern. *See* Ex Parte No. 274 (Sub–No. 16) *Exemption of Rail Line Abandonments or Discontinuance—Offers of Financial Assistance,* decided Dec. 14, 1987.

eventual abandonment. *Id.* at 153–54. Similarly, a shipper dependent on a particular line but who (somehow) fails to use the line for two years can likewise be expected, in reason, to shoulder the burden of monitoring material developments under such rather unusual circumstances; a shipper of that sort cannot reasonably presume an indefinite continuation of service on a manifestly marginal line. *Id.* at 154. Finally, a new business that wishes to employ the affected line can reasonably be expected to inquire into the line's future, with the railroad presumably having no reason to be less than forthright about any plans to abandon the track. *Id.*

In the absence of indications that additional notice is necessary to promote cooperation with the States, the Commission's classic line-drawing choice of sixty days' notice appears reasonable.[15] We are further persuaded that the Commission's determination, predicated as it is on the agency's experience, is entirely in keeping with the deregulatory thrust of the Staggers Act.

### III

We turn to the next major area of concern articulated in our prior visitation to this case, namely the ICC's treatment of section 10505's second prerequisite to exemption. To recap, in order to qualify for an exemption, section 10505 requires *either* that the transaction be of limited scope, *or* that application of the statutory provision be unnecessary to protect shippers from the abuse of market power. 49 U.S.C. § 10505(a)(2) (emphasis added). In its original decision, the Commission failed to examine whether its findings on these points

were valid in light of the expanded definition of "out of service" contained in the final rule. *Illinois Commerce Comm'n,* 787 F.2d at 634–35. On remand, the ICC reaffirmed its conclusions, finding that the exemption, as expanded, was limited in scope and that regulation was unnecessary to protect shippers from market power abuses. *Out of Service,* 2 I.C.C. at 156.

Illinois challenges both determinations, arguing that the exemption, as expanded, is not limited in scope and that regulation is necessary to protect shippers. Brief for Illinois at 20–29; Brief for New York at 8. We need not plumb the depths of the first point, however, inasmuch as we are satisfied that the agency acted properly under the "abuse of market power" clause. *See Illinois Commerce Comm'n v. ICC,* 819 F.2d at 314 (requirements of section 10505(a)(2) are disjunctive; as long as the ICC properly determined that regulation is unnecessary to protect shippers from abuse of market power, it need not find the exempt transaction to be limited in scope).

■ The Commission provides a reasonable explanation for its conclusion that regulation of abandonments is unnecessary to prevent the abuse of market power. Essentially, the ICC relies on the proposition that a carrier's market power is unaffected by an abandonment. *Out of Service,* 2 I.C.C.2d at 156. The carrier's market power is determined not by the presence or absence of particular lines, but by the existence (or lack) of transportation alternatives available to shippers. Obviously, a carrier does not compete with itself, with one routing option vying with another for the greater share of traffic. If a carrier

---

15. In his partial dissent, our colleague quite rightly emphasizes the role of the States in carrying on the implementation of a sound and efficient rail transportation system. With that role we have not the slightest quarrel. Consonant with our historic system of federalism fashioned at the Founding, Congress has ordained a vital, complementary role for the States in the rebuilding and maintenance of the Nation's rail transportation system. That being said, our disagreement rests entirely on a narrow but important point, namely whether it is for this court to tear asunder the carefully crafted scheme erected by the Commission in vindicating the various (and at times competing) elements of the rail transportation policy. Fundamental values of federalism informing the statutory scheme are, we are satisfied, secured by the system which the ICC has erected. True, the States are no longer afforded the four-months' notice provided by the System Diagram Map mechanism. But the ICC focused specifically on the question of notice and deemed, for reasons we think sufficient to pass judicial muster, the notice mechanism under the new regime ample to vindicate those values. That being so, we are not at liberty to undo what the Commission has done in this particular.

lacks market power prior to abandonment, then the carrier's decreasing the number of available routes on its own lines will do nothing to create power that did not otherwise exist. That is to say, after the abandonment, the carrier will be subject to the same competitive forces as previously. Conversely, if a carrier possess market power prior to an abandonment, reducing its routing options will neither augment nor diminish that power. *Id.* Although, as Illinois elaborately explains, abandonments may obviously alter a carrier's operations, *see* Brief for Illinois at 21–24, such alterations do not bear on the extent of competition (either from other rail carriers or from other modes of transportation) to which the carrier is subject.

Somewhat more specifically, the challengers emphasize the effect of abandonments on shippers located adjacent to the abandoned line. Illinois and New York hypothesize that railroads will employ the exemption as a device to sever important lines providing service to overhead shippers. *Id.* at 31–33; Brief for New York at 6–8. According to this gloomy view, when a line is severed, shippers located on the segments adjacent to the abandoned section will suffer from the exercise of the carrier's increased market power. *Id.* Although Illinois cites a specific instance of abandonment within its borders as an example of this phenomenon, the State fails to explain how, if at all, the abandonment led to an abuse of market power. The sole evidence adduced by Illinois is a difference in rates charged to shippers on the two segments of line that were severed by the abandonment. Brief for Illinois at 33. For starters, however, Illinois does not explain how the rate differential constituted an abuse of market power.[16] Nor does Illinois demonstrate how the abandonment enabled the carrier to charge the differential; pre-

sumably, for reasons previously set forth, the carrier could have increased the rate charged the shippers on both segments of the line prior to the abandonment. *See Illinois Commerce Comm'n v. ICC,* 819 F.2d at 314–15 (although the acquisition of trackage rights under a class exemption may enable carriers to alter routes or raise rates on old routes under threat of abandonment, such behavior is not an "abuse of market power," but rather reflects the economics of the marketplace.)[17]

Thus, the rationale informing the Commission's "market power" determination appears sound; indeed, on remand the agency has more than adequately covered its tracks. In the absence of concrete evidence to the contrary, we are satisfied that the ICC's treatment of the "abuse of market power" factor was neither arbitrary nor capricious.

## IV

The final issue remanded to the ICC involved the protection of railroad employee interests. Section 10505(g) prohibits the Commission from exercising its exemption authority to relieve a carrier of its obligation to protect employee interests. 49 U.S.C. § 10505(g). Pursuant to this mandate, the ICC ordered the standard labor protections, adopted by the agency in *Oregon Short Line R.R.—Abandonment—Goshen (OSL),* 360 I.C.C. 91 (1979), applicable to carriers seeking to abandon lines under the auspices of the Commission-fashioned exemption. Observing that the *OSL* protections constituted only the requisite minimum, the court faulted the ICC for failing to clarify the appropriate procedures for seeking enhanced labor protection conditions. *Illinois Commerce Comm'n,* 787 F.2d at 636.

---

**16.** We note that if a rate differential is imposed in a discriminatory fashion, an affected party can seek a remedy under 49 U.S.C. § 10741(b).

**17.** In response to the abandonment cited by Illinois as an example of market power abuse, the ICC refers to the agency's unchallenged findings in that case, namely that the line involved carried little overhead traffic and, thus, any effect on overhead traffic (and, presumably, any

potential for abuse of market power) would be *de minimis.* Brief for Respondents at 30–31. The Commission further observed that in the rare situation where an exempt transaction results in market power abuse, affected shippers may challenge the abandonment in *post hoc* proceedings. *Id.* at 31 (citing *Illinois Commerce Comm'n,* 819 F.2d at 315 & n. 3).

Responding to the court's directive, the Commission on remand established that the appropriate procedure by which labor organizations may seek higher levels of employee protection is a petition for partial revocation. *Out of Service*, 2 I.C.C.2d at 157. In the wake of the Commission's ameliorative action, the attack on this point is now waged all alone by Simmons,[18] who claims (for the second time) that protective conditions in abandonment proceedings must be implemented prior to consummation.[19] Simmons contends that *OSL* requires preservation of the *status quo* until the necessary labor protections are embodied in an agreement. Brief for Illinois at 34–35. Simmons claims that reconsideration rather than revocation should have been the procedural vehicle embraced by the ICC. *Id.* at 35 n. 35.

■ Although the Commission's discussion fails expressly to address Simmons' point, we nevertheless find nothing arbitrary or capricious in its action. Undoubtedly, we would have been edified by the agency's views as to the proper interpretation of *OSL*. But in view of our express rejection of Simmons' argument the last time around, *see supra* note 19, we cannot fault the Commission for failing to set forth its views in this particular. *See Illinois Commerce Comm'n*, 787 F.2d at 636 n. 157. As the old saying goes, enough is enough. What is more (than enough), the ICC provided a sensible explanation for its determination that post-abandonment revocation constitutes an adequate procedure to safeguard employee interests. The Commission pointed to the extremely limited number of abandonment cases under the

statutory procedures in which labor interests had established a case of protections going beyond the *OSL* conditions. *Out of Service*, 2 I.C.C.2d at 157.[20] The ICC further predicted that the labor-related effects of abandonment of "out of service" lines would be minimal, since few employees would likely be serving lines that had generated no local traffic for over two years. *Id.* Moreover, to the extent that the *OSL* conditions may prove inadequate, the Commission's procedures expressly permit, as we have just seen, those conditions to be augmented as circumstances warrant. *Id.*

Simmons says nothing that undermines the agency's reasoning, nor does he indicate how the legitimate interests of employees are prejudiced by consideration of protection issues *post* abandonment (again, in view of the panoply of remedies afforded by the standard *OSL* conditions). In light of (1) the small number of cases in which labor protection conditions would likely require augmentation, (2) the limited universe of railroad employees involved, and (3) the absence of any showing of prejudice to labor interests, it was reasonable for the Commission to conclude that pre-consummation consideration of labor protection issues beyond the OSL conditions is unnecessary to protect employees' interests.

### V.

■ Having determined that the Commission has adequately addressed the concerns expressed in our previous opinion, we proceed to consider the arguments raised by Rails to Trails Conservancy ("RTC") in its appeal from the Commission's denial of RTC's petition for reconsideration.[21] RTC

---

**18.** Neither Illinois nor New York joins Simmons in challenging the Commission's treatment of this issue.

**19.** In their prior appeal, Illinois and Simmons asserted that "relegation of the issue of adequacy of employee protections to post-abandonment revocation procedures would violate an administrative rule that the Commission must establish the level of employee protection before consummation of an abandonment." *Illinois Commerce Comm'n*, 787 F.2d at 636 n. 157. The court expressly rejected the argument, stating that the case cited by petitioners for the proposition did not in fact support it. Undaunted by

this adverse determination, Simmons continues to press the point.

**20.** This should not be surprising, in view of the generous package of protections embodied in the *OSL* package, including in some cases full pay for up to six years for employees laid off by virtue of the abandonment. *See OSL*, 360 I.C.C. at 98–103.

**21.** Petitioner Rails to Trails Conservancy is joined by Iowa Trails Council and Conservation Federation of Maryland. These petitioners are public interest corporations devoted to minimizing adverse environmental impacts flowing

argues, first, that inadequate consideration was given to environmental consequences during the rulemaking itself, in violation of section 102 of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332 (1982). In its order denying reconsideration, the ICC rejected this contention, in part because the rulemaking would not result in more or less abandonments being granted, but instead would simply reduce regulatory burdens on abandonments that would occur in any event, and hence could have no environmental impact. The ICC's reasoning here is unsatisfactory, for it is not at all apparent that a change in procedure alone will not affect the environment—the new procedure may, for example, lessen the opportunity for environmental groups to influence the agency's final decision. The procedural nature of a regulation does not, therefore, exempt an agency from complying with NEPA and preparing an environmental assessment ("EA") or an environmental impact statement ("EIS") where appropriate.[22]

■ Contrary to RTC's suggestion, however, we do not believe the Commission did, in fact, ignore environmental factors when it promulgated this regulation. In its first rulemaking (prior to remand), the Commission noted that track removal and dispositions of rights-of-way could affect the environment and correctly stated that its exemption authority did not extend to exempting transactions from relevant environmental laws. Thus the Commission required parties seeking exemptions to submit evidence on environmental issues. 49 C.F.R. § 1152.50(d)(4) (1985). The Commission also cautioned that individual exemption authorizations "may at times be conditioned upon compliance with environmental conditions." *Exemption of Out of Service Rail Lines*, 366 I.C.C. 885, 890 (1983); *Illinois Commerce Comm'n*, 787 F.2d at 629 n. 89. Furthermore, subsequent to the rulemaking, in response to concerns raised by its own staff, the Council on Environ-

mental Quality ("CEQ"), and RTC, the Commission has engrafted onto the abandonment regulations additional procedures to ensure compliance with NEPA and other environmental statutes at the individual abandonment stage.

It is true, nevertheless, that the Commission was obligated by its own regulations and those of CEQ to prepare at least an EA prior to promulgating this regulation. But because the Commission did not ignore environmental consequences during the rulemaking, and subsequently has developed procedures to focus on those consequences when individual abandonments are authorized, we decline to remand. An order to the Commission to prepare an EA or an EIS and engage in rulemaking for a third time would be a meaningless gesture, not necessary to guarantee that the Commission will consider environmental concerns when it authorizes abandonments. *See Kerner v. Celebrezze*, 340 F.2d 736, 740 (2d Cir.1965) (Friendly, J.) (remand for procedural error not necessary where it would accomplish nothing "save further expense and delay").

We turn next to RTC's contention that the actual procedures established by the regulation will result in the violation of NEPA each time the Commission authorizes an exemption. Under the regulation as promulgated, a carrier seeking an exemption must file a notice with the appropriate state Public Service Agency ten days prior to filing with the Commission. The carrier's application to the Commission itself must address environmental issues, and must be submitted fifty days before the date of abandonment. Within twenty days after receiving the application, the Commission publishes notice of abandonment in the Federal Register, and the exemption is effective thirty days later without any further Commission action. Under the regulation as originally promulgated, petitions to stay the exemption had to be filed within ten days of publication of no-

from rail abandonments and to fostering public use, including public recreational trail use and rail banking, of railroad rights-of-way scheduled for abandonment.

**22.** An environmental assessment serves to aid an agency's compliance with NEPA when no environmental impact statement is necessary. 40 C.F.R. § 1508.9 (1987).

tice in the Federal Register, and petitions to reconsider within twenty days. Those deadlines have since been modified by the Commission, as will be discussed below.

RTC attacks this regulation on grounds that it impermissibly shifts to private parties the burden of raising environmental concerns, that it allows the Commission to authorize an abandonment without considering the effect of that action on the environment, that it sets such a high burden on an applicant for a stay or reconsideration that abandonments will go forward despite submission of valid objections, and that the short notification period does not provide a reasonable opportunity for public participation.

RTC raises several powerful points, and if the regulation had not been modified at all in response to environmental concerns, the appropriate disposition of RTC's petition would be a remand to the Commission. Nevertheless, a remand is no longer necessary, for in several subsequent orders the Commission has addressed RTC's concerns by adding additional procedures and clarifying the burden that intervenors must meet to stay an abandonment proceeding. These subsequent orders, in addition to representations by counsel for the Commission at oral argument, persuade us that the current procedural regime for authorizing abandonments is not facially inconsistent with NEPA and other environmental statutes. Nothing we decide here, however, affects the rights of these petitioners or any others to challenge the adequacy of the Commission's procedures as applied to a particular abandonment.

■ We agree with RTC that, under the regulation as originally promulgated, the Commission's reliance on private parties to raise environmental concerns was unlaw-

ful. The Commission may not delegate to parties and intervenors its own responsibility to independently investigate and assess the environmental impact of the proposal before it. *Harlem Valley Transp. Ass'n v. Stafford,* 500 F.2d 328, 336 (2d Cir.1974); *see also Steamboaters v. FERC,* 759 F.2d 1382, 1394 (9th Cir.1985); *Calvert Cliffs' Coordinating Comm., Inc. v. Atomic Energy Comm'n,* 449 F.2d 1109, 1118–19 (D.C.Cir.1971). In December 1987, however, the Commission instructed its Section of Energy and Environment to complete and make available to the public an environmental assessment within five days of publication of the exemption notice in the Federal Register.[23] At oral argument, counsel for the Commission represented that this EA would be the product of independent staff investigation and evaluation of the abandonment proposal—not a *pro forma* reworking of the applicant's assertions regarding environmental impact.

RTC questions whether an adequate EA can possibly be prepared in the time allotted. We review the Commission's judgment that its procedure satisfy NEPA for abuse of discretion. *See Vermont Yankee Nuclear Power Corp. v. Nat'l Resources Defense Council,* 435 U.S. 519, 554, 98 S.Ct. 1197, 1217, 55 L.Ed.2d 460 (1978); *Kleppe v. Sierra Club,* 427 U.S. 390, 412–14, 96 S.Ct. 2718, 2731–32, 49 L.Ed.2d 576 (1976). While the time for preparation of an EA is abbreviated, particularly if the proposed abandonment is extensive, *see Scientists' Inst. for Pub. Information, Inc. v. Atomic Energy Comm'n.,* 481 F.2d 1079, 1092 (D.C.Cir.1973) (NEPA statements will vary in length and complexity in relation to size of project being considered), we cannot say, in the context of this facial challenge, that the Commission has acted

---

**23.** The Commission's notice states:

> In consultation between Commission staff and the Council on Environmental Quality, an issue has arisen concerning the timing of Environmental Assessments (EAs) in abandonments under this exemption. To assure adequate notice and opportunity for the public to comment on these documents, we are instructing our Office of Transportation Analysis (OTA), which includes the Section of Energy and Environment (SEE), to assure that EAs

are completed and available within 5 days of publication of the notice of exemption in the Federal Register (FR). The fact that EAs will be available at that time upon request will be noted in each FR notice and SEE will continue to serve the parties and every agency with whom it has consulted in preparation of the document.

Ex Parte No. 274 (Sub–No. 8) *Exemption of Out of Service Rail Lines* (not printed), served Dec. 29, 1987.

arbitrarily. Furthermore, if an abandonment application does present complex environmental problems, the Commission may on it own motion stay the exemption to allow an adequate EA or EIS to be prepared by its staff.

RTC also contends the EA comes too late in the authorization process to be meaningful. Council on Environmental Quality regulations require that "NEPA procedures must insure that environmental information is available to public officials and citizens *before decisions are made and before actions are taken.*" 40 C.F.R. 1500.1(b) (emphasis added). RTC asserts that the publication of notice of abandonment in the Federal Register is the relevant agency action or decision, and argues that the EA must therefore be prepared prior to publication, and not five days later, as provided by current procedures.

■ We think this argument is overly technical—an order to the Commission to prepare the EA five days earlier so as to coincide with publication of notice would exalt form over substance. The decision at issue here—that a particular abandonment is not subject to regulation—is not made at the moment notice is published in the Federal Register. While it is true, as RTC notes, that the exemption may become effective thirty days after publication without further action by the Commission, publication is nevertheless not the final step. The Commission's staff continues to investigate and assess environmental issues after publication, and if the staff or any intervenors raise questions suggesting the exemption should not be granted, the Commission will stay authorization while it considers such issues. Hence, publication of notice prior to completion of the EA does not conflict with NEPA, for it does not diminish the Commission's capacity to take environmental concerns into account in its decisionmaking. No "irretrievable commitments" of agency or private resources occur upon publication, nor are options precluded or positions finally determined. *See Scientists' Institute*, 481 F.2d at 1094. Rather, the notice serves to alert interested parties about the abandonment and pro-vides information on how to obtain the EA and request a stay or reconsideration. Of course, since publication of notice is not itself the final decision, the Commission, or some responsible official delegated authority by the Commission, must formally consider staff recommendations contained in the EA and comments by intervenors at some time prior to the effective date of abandonment. Moreover, the record of the abandonment authorization must clearly reflect this, in order to withstand subsequent judicial review. *See id.* at 1094–95. It must reflect, as well, an affirmative determination that the agency's environmental analysis permits the rail abandonment to go forward. Otherwise, a substantive decision may be made—the granting of the exemption—without the agency ever taking a hard look at environmental factors. As this court has held, "NEPA was intended to ensure that decisions about federal actions would be made only after responsible decision-makers had fully adverted to the environmental consequences of the actions, and had decided that the public benefits flowing from the actions outweighed their environmental costs." *Jones v. District of Columbia Redevelopment Land Agency,* 499 F.2d 502, 512 (D.C.Cir.1974), *cert. denied,* 423 U.S. 937, 96 S.Ct. 299, 46 L.Ed.2d 271 (1975).

■ RTC correctly asserts that after an exemption is finally authorized and the railroad begins to tear up the track and dispose of the right-of-way, alternatives are clearly foreclosed and it would be too late at that point for the Commission to consider environmental factors. And yet, RTC argues, if the Commission declines to grant a stay at the request of an intervenor who raises environmental concerns, because the intervenor has failed to make the required showing of probability of success and irreparable injury, the abandonment process will go forward even though the Commission may not have responded to serious questions presented it. Thus, according to RTC, a short notice period and a high threshold for granting a stay conspire to prevent the full consideration of environmental issues demanded by NEPA *before* major federal action is taken.

The Commission has responded to RTC's concern by informing this court in its brief and at oral argument that the Commission's current practice is to "stay any individual abandonment of an out-of-service line if environmental issues are raised and cannot be resolved through a Commission decision before the exemption would otherwise become effective for that line." Brief for the ICC and the United States at 40; *see also* ICC Docket No. AB–32 (Sub.–No. 36X), *Boston & Maine Corporation and Springfield Terminal Railway Company—Abandonment and Discontinuance of Service* (not printed), served Nov. 25, 1987. At oral argument, counsel for the Commission stated that no showing of irreparable harm or probability of success is required of intervenors or parties who raise environmental concerns—a stay will automatically be granted until the concerns are resolved by the Commission. As this procedure obviates the possibility that an abandonment would be authorized even though environmental questions were still outstanding, a remand is not necessary.

The importance of an EA or an EIS lies not merely in the aid it may give to the agency's own decisionmaking process, but also in the notice it gives the public of both the environmental issues the agency is aware of and those it has missed. The EA or EIS should provide a springboard for public comment, bringing to the agency viewpoints and options it might otherwise lack. *See Calvert Cliffs' Coordinating Comm.*, 449 F.2d at 1114; 40 C.F.R. § 1501.2(d)(2). RTC contends that the procedures set forth on the abandonment regulation fail to provide a reasonable period of time for meaningful public comment. A railroad seeking an abandonment exemption must notify the state public service commission ten days prior to filing the exemption provision. The Commission states that public interest groups such as RTC could establish a relationship with the public service commission in their locality and so receive early notification that an exemption will be requested. No EA

would be available at that time, though, and so the usefulness of such notice to environmental groups is limited. The Commission, moreover, does not advance any evidence that state public service agencies will perform this service, and, in fact, the Commission's own staff in comments concerning another exemption proceeding suggest that state agencies do not carry out this function very well. "The designated agency ... cannot circulate the environmental notice quickly enough to afford any meaningful opportunities for involvement in the ICC's decisionmaking process." Comments of the Section of Energy and Environment on Class Exemption for the Construction of Connecting Tracks under 49 U.S.C. § 10901. J.A. at 300. We therefore give little weight to this method of notification.

Five days after the notice of exemption is published in the Federal Register, the EA prepared by the Commission's staff will be publicly available. Parties and intervenors then have fifteen days to request a stay.[24] If the Commission required a detailed statement and a showing of irreparable injury and probability of success, this time period might be inadequate as a matter of law, but since, as we have stated, the Commission has indicated it will grant a stay upon a minimal showing, we cannot hold that fifteen days is always impermissibly short. Where, in a particular abandonment proceeding, special circumstances render fifteen days unreasonably short even to make a minimal showing, the Commission could grant an extension in order to comply with NEPA. We therefore decline to rule that the Commission's procedures, as set forth in the regulation and modified by subsequent action, are facially inconsistent with NEPA.

■■■ In addition to its arguments regarding lack of compliance with NEPA, RTC asserts that the Commission's procedures violate section 106 of the National Historic Preservation Act, 16 U.S.C. § 470f (1982). Like section 102 of NEPA, section

**24.** The Commission has stated that it will no longer require stay petitions to be filed within ten days of Federal Register publication. Stay petitions may therefore be filed within the twenty day period allotted for petitions to reconsider.

106 of the Historic Preservation Act is a "stop, look, and listen" provision; it requires federal agencies to take into account the effect of their actions on structures eligible for inclusion in the National Register of Historic Places. As the Commission recognized in its first rulemaking (prior to remand), track abandonment may affect historic structures. *Exemption of Out of Service Rail Lines,* 366 I.C.C. 885, 890 (1983). In order to fulfill its obligations under the Historic Preservation Act, the Commission requires applicants for abandonment exemptions to include in their application information concerning whether any sites listed in the National Register of Historic Places are affected. Furthermore, the applicant must submit detailed descriptions of any affected structures fifty years old or older to the appropriate State Historic Preservation Office. 49 C.F.R. 1105.7(c)(10) (1987).

RTC's attack on the Commission's Historic Preservation Act procedures is similar to its arguments concerning NEPA. In particular, RTC asserts that publication of notice of abandonment prior to consultation with state and federal agencies concerning historic preservation violates the Act. For the reasons stated in our discussion of NEPA, we do not agree. So long as the record in an individual abandonment shows that the required consultations and deliberations concerning historic preservation occur before the exemption becomes effective, the purposes of the Historic Preservation Act are met.

▪ Section 8(d) of the National Trails System Act, 16 U.S.C. § 1247(d) (Supp. II 1984), directs the Commission to encourage state and local agencies and private parties to establish recreational trails along abandoned rail lines. *See also* 49 U.S.C. § 10906. Such use serves to preserve established rights-of-way for future reactivation as working railroads—hence the name "rail banking." Section 1247(d) provides that any line preserved in this way shall not be treated as abandoned—thus preventing rights-of-way obtained through easements from reverting to their owners upon the cessation of railroad use. *See generally Washington State Dep't of Game v. ICC,* 829 F.2d 877 (9th Cir.1987). RTC contends that the Commission has failed to consider its obligations under section 8(d) in issuing the abandonment regulation. We disagree. The regulation specifically provides that persons interested in interim use of abandoned rail lines as recreational trails may submit evidence, and refers the reader to 49 C.F.R. § 1152.29 (1987) which sets out the statement required of prospective users. Although the regulation requires the statement be submitted within ten days, the Commission has informed the court that "it would accept and act on late-filed Trails Act requests so long as it still retains jurisdiction to do so." Brief of I.C.C. and United States at 37.[25] Private organizations and state or local agencies interested in interim use of rail lines may monitor the Federal Register and upon notification of an abandonment, may make the submission required by § 1152.29. We reject FTC's contention that the time allotted under the Commission's regulation as modified is not adequate, and we do not believe the Commission has ignored its obligations under section 8(d) of the National Trails Systems Act.[26]

MIKVA, Circuit Judge, concurring in part and dissenting in part:

Abandoning rail lines can be a crucial cost-saving measure for a rail carrier trying to revitalize its operations. But it can also adversely affect local shippers and

---

**25.** The Commission has stated that according to 49 U.S.C. § 10505(c), its jurisdiction over exempted abandonments would appear to extend indefinitely. Brief at 37 n. 28. *See also* Ex Parte No. 274 (Sub–No. 13), *Rail Abandonments—Use of Rights of Way as Trails—Supplemental Trails Act Procedures,* decided December 2, 1987.

**26.** RTC adverts to, but does not directly challenge, the Commission's interpretation of section 8(d) as requiring it to condition rail-to-trail conversions on negotiations of voluntary agreements between abandoning railroads and prospective interim trail users. *See generally Washington State Dep't of Game v. ICC,* 829 F.2d 877 (9th Cir.1987). We have no occasion, therefore, to pass on the reasonableness of that interpretation.

have a devastating impact on the economic development strategies of cities and towns. Recognizing that rail infrastructure is a vital national resource, Congress struck a careful balance in its regulation of abandonments—attempting to minimize delays where abandonment was truly the best course, while facilitating preservation of rail lines that offered continued commercial (or other) benefits. A key intermediary in Congress' scheme for preserving viable rail lines was state government. Yet, in the exemption regulation now before us, the Interstate Commerce Commission ("ICC" or "Commission") effectively disregarded the crucial role that Congress delegated to states. Accordingly, I dissent from that part of today's decision that permits rail abandonments without providing states with meaningful advance notice; I otherwise concur in the majority's opinion.

As the majority opinion explains, in order to justify the exemption of railroad activity from a federal law, the ICC must demonstrate that the particular law "is not necessary to carry out the transportation policy of [the United States]." 49 U.S.C. § 10505(a)(1) (1982). That national policy is specified in another section of the rail statute, and it includes this goal: "[T]o cooperate with the States on transportation matters to assure that intrastate regulatory jurisdiction is exercised in accordance with the standards established in [federal railroad law]." 49 U.S.C. § 10101a(9) (1982). The goal of having states adhere to federal "standards" should not be interpreted narrowly. Congress has done more than simply instruct states to abide by federal regulations; it has delegated to states a specific role in the implementation of national rail policy. States' compliance with federal "standards" must therefore be read in the broad sense: federal policy should facilitate states' performance of the duties assigned to them. *See Illinois Commerce Commission v. ICC,* 787 F.2d 616, 631 (D.C.Cir.1986) (noting that *"any* sort of cooperation with the states on transportation matters" is likely to further the nation's rail policy goal (emphasis added)).

To evaluate whether the ICC's exemption of railroad abandonments is proper, this court must therefore determine whether the statutes from which abandonments have been exempted are "not necessary" to the goal of "cooperat[ing] with the states on transportation matters." I believe the exemption fails that test in one crucial respect.

Since 1976, Congress has required railroads to maintain System Diagram Maps and to make these available to the Commission and the public. The maps must be regularly updated to show "railroad lines potentially subject to abandonment" as well as "each railroad line for which the carrier plans to file an application for a[n abandonment] certificate." 49 U.S.C. § 10904(e)(2) (1982). The importance of the system maps to Congress' larger regulatory scheme is made clear in one of the restrictions imposed on abandonments. Congress gave state governments the power to block the abandonment of any rail line that has not been "described and identified in the diagram ... that was submitted to the Commission at least 4 months before the date on which the [abandonment] application was filed." 49 U.S.C. § 10904(e)(3) (1982).

Congress thus believed that states needed at least four months' advance notice about potential abandonments in order to fulfill their role of protecting local economic and transportation needs. That protective role encompassed multiple responsibilities. For example, Congress established a mechanism for reviving rail lines that were targeted for abandonment, through an offer to subsidize or an offer to purchase the line by a "financially responsible person." 49 U.S.C. § 10905(d)(1) (1982). Such a "person" includes "a government authority," *id.,* and obviously states are the primary governments intended. Similarly, Congress created a "feeder development program" for the rescue and upgrading of lines that railroads have designated on their system maps as subject to abandonment but have not yet sought to abandon. 49 U.S.C. § 10910 (1982). Once again, financially responsible persons including "a government authority" are expected to initiate such feeder development proposals.

States are also designated among the prime movers in the interim trail use program that Congress established for soon-to-be-abandoned rail lines. *See* 16 U.S.C. § 1247(d) (Supp. II 1984); 49 C.F.R. § 1152.29 (1987). Finally, although states are not expressly named, they are clearly expected to initiate preservation of rail lines for "highways, other forms of mass transportation, conservation, energy production or transmission, or recreation" under the "Sale for Public Purposes" provision that Congress enacted. 49 U.S.C. § 10906 (1982). *See* Railroad Revitalization and Regulatory Reform Act of 1976, Pub. L. No. 94–210, § 809(b)(2), 90 Stat. 31, 145 (authorizing grants "to *State* and local governmental entities to enable them to plan, acquire, and develop recreational or conservational facilities on abandoned railroad rights-of-way" (emphasis added)) (codified at 49 U.S.C. § 10906 note (1982)).

This is a formidable array of responsibilities for states to carry out. It is not hard to fathom Congress' purpose, therefore, in granting states at least four months' advance notice of a railroad's intent to abandon a rail line. Indeed, when Congress enacted the System Diagram Map requirements in 1976, the Senate Committee that developed the plan explained its overall objective in this fashion: "Of paramount concern to the Committee is the impact of rail abandonments on local communities, mostly rural in character. The Local Rail Service Assistance Program offers these communities an opportunity to keep their rail service. It rightfully places the responsibility for making the decisions on the essentiality of local rail service *with State and local officials.*" S.Rep. No. 499, 94th Cong., 1st Sess. 44 (1975) (emphasis added).

The ICC exemption regulation that is now before this court exempts certain abandonments from the four-month requirement for designations on the System Diagram Maps. Rail lines eligible for this exemption include not only those lines that have been completely unused for two years but also segments that have carried only overhead traffic for that period. In lieu of the four-month advance notice, the ICC now permits a rail carrier seeking to abandon such rail lines simply to notify the state ten days before it notifies the ICC. The state then has no more (and possibly less) than forty days to request a stay of the effective date of the abandonment. If the ICC does not stay the abandonment, the railroad is free to dismantle the track, sell the rail line, or otherwise dispose of the land and right-of-way, beginning twenty days after the deadline for requesting a stay has expired. Obviously, these severe time constraints will make it extremely difficult, if not impossible, for states to carry out their responsibilities with respect to exempt abandonments.

In our court's initial review of this exemption regulation two years ago, we chastised the ICC for failing even to examine the impact of the exemption on state governments:

> We think the Commission should have considered the many comments submitted by the states decrying the lack of notice of proposed abandonments.... From aught that appears, the Commission paid no heed to these comments.

*Illinois Commerce Commission v. ICC,* 787 F.2d at 631. On remand, however, the Commission responded to the court's concerns in a superficial and conclusory manner. "System diagram map notice is not essential to State rail planning in this instance," the ICC blithely declared. 2 I.C.C. 2d 146, 153 (1968). "Lines generating no traffic are unlikely to contribute to a State's business economy, but if such a line is considered crucial, a State should monitor its activity because nonuse usually heralds eventual abandonment." *Id.* at 153–54. The ICC's notion that states only worry about rail lines that currently "contribute to [their] business economy" betrays a disregard for states' multiple responsibilities. A state government must also consider whether lines are being relied upon (or could be used) for future economic development. It must ascertain, as well, whether the railbed may be useful for highways, mass transit, recreational conversion or other purposes. There are thousands of miles of rail lines in this country that are potential candidates for abandonment.

*See, e.g.,* S.Rep. No. 499, 94th Cong., 1st Sess. 43 (1975). The Commission's cavalier suggestion that state governments can readily monitor the status of all of these rail lines borders on the fanciful.

Yet, the burden imposed on states is even more unreasonable than the ICC's description suggests. It must be remembered that the rail lines that qualify for exempt abandonment include lines that are currently carrying rail traffic but do not contain local shippers who originate or receive any shipments. Thus, a rail segment that bears overhead traffic in the middle of a longer line that does service local shippers is fully eligible for the abandonment exemption—a fact somewhat obscured by the Commission's description of eligible lines as lines experiencing "nonuse." The notion that states should scrutinize active rail lines within their borders, ascertaining which are the segments that generate no local traffic and whose overhead traffic could be rerouted, is patently ludicrous. The Commission's cursory treatment of this problem also disregards this court's express instructions following our previous review. In remanding the case, this court directed the ICC "to reevaluate the impact of the exemption [in light of the fact that the definition of 'out of service'] was extended to lines over which overhead traffic is traveling." 787 F.2d at 635.

The majority in today's decision cloaks the agency's inadequate analysis with the mantle of reasoned inquiry. The agency, we are told, "squarely responded" to this court's concerns. Majority opinion ("maj. op.") at 1253. But my colleagues do no more than recite the agency's *ipse dixit* about the capacity of states to "monitor" rail lines, assuring us that the ICC's analysis is "predicated ... on the agency's experience." Maj. op. at 1254.

The majority also relies on the Commission's conclusion that "the benefits of additional notice accruing to the small number of States and shippers affected by abandonments of out-of-service lines are outweighed by the costs to railroads both in maintaining the Maps and in delaying desired abandonments for four months."

Maj. op. at 1253. Such a cost-benefit analysis may be noteworthy. It may even be correct. But it is no substitute for the analysis that Congress expressly required. The ICC must find that the System Diagram Maps are "not necessary" to the goal of "cooperat[ing] with the states on transportation matters." The Commission's attempt to do that is a model of unreasoned decisionmaking that is not supported by the evidence. I would hold this aspect of the exemption regulation arbitrary and capricious and remand for the ICC to either fish or cut bait: if there are reasons why this important congressional protection of states' transportation concerns can be waived, they should be stated; otherwise, the exemption regulation can be effective without such a waiver.

Apparently, my colleagues dispute this last point. They imply—in a footnote—that the exemption of abandonments really cannot be effective if the system map requirement is reinstated. By reinstating this requirement, the majority suggests, we will "tear asunder the carefully crafted scheme erected by the Commission." Maj. op. at 1254 n. 15. The majority has chosen the wrong "scheme" as the object of its reverence. It is *Congress'* carefully crafted scheme that holds primary claim to our respect. And it is the ICC that has "torn asunder" Congress' scheme, making it all but impossible for states to carry out their responsibilities in promoting the national rail policy. The ICC, moreover, has accomplished this result without demonstrating its necessity. The Commission—like today's majority—seems to view exemptions as a package deal: abandonments must be exempt from *every* constraint or none at all. It is this all-or-nothing approach to deregulation that "tears asunder" legislative policy and that we should reject.

By exempting certain rail abandonments from statutory limitations, the ICC sought a worthwhile goal: to make it easier for railroads to convert unproductive property into useful assets. But this benefit can be largely preserved, even if the railroads are required to continue updating the system maps. Unless the ICC can demonstate that

the maps are not needed for the purpose they were intended to serve, I would salvage this important element of Congress' "carefully crafted scheme."