**ILLINOIS COMMERCE COMMISSION,
et al., Petitioners,**

v.

**INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents,**

**Illinois Central Gulf Railroad
Company, Intervenor.**

No. 86–1386.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 12, 1987.

Decided May 19, 1987.

Gordon P. MacDougall, Washington, D.C., with whom James E. Weging was on the brief, for petitioners.

Charles Alan Stark, Attorney, I.C.C., with whom Robert S. Burk, Gen. Counsel, Ellen D. Hanson, Associate Gen. Counsel, I.C.C., John J. Powers, III and Robert J. Wiggers, Attys., Dept. of Justice were on the brief, for respondents.

J. Thomas Tidd, Hollis G. Duensing, John T. Sullivan, were on the brief for amicus curiae, Association of American Railroads, urging the affirmance of the I.C.C. decision.

Howard Koontz, Chicago, Ill., entered an appearance for intervenor.

Before WALD, Chief Judge, SILBERMAN, Circuit Judge, and REVERCOMB,* District Judge.

Opinion for the Court filed by Chief Judge WALD.

* Of the United States District Court for the District of Columbia, sitting by designation pursu-

WALD, Chief Judge.

Petitioners challenge the Interstate Commerce Commission's (ICC) decision to exempt from regulation all written trackage rights agreements not made in the context of rail consolidation proceedings. *See* 1 I.C.C.2d 270 (1985). Because we conclude that the ICC did not act improperly by granting this broadscale exemption, we deny the petition for review.

## I. BACKGROUND

Trackage rights agreements are arrangements by which one railroad company allows another to use its railroad tracks. These agreements can take one of two different forms. The owner railroad may allow the tenant railroad to serve freight customers along the leased track or may limit the tenant railroad to use of the track from one point to another, withholding permission to serve customers along the route. The ICC refers to the first kind of agreement as "extension trackage rights transactions" and the latter kind as "bridge trackage rights transactions." *See, e.g.,* 1 I.C.C.2d at 278.

Despite the restriction against serving local shippers along the track, "bridge agreements" are often attractive to railroads because they allow a carrier to create new routes for long-distance customers. For example, if a railroad already has trackage rights from New Orleans to Memphis and from St. Louis to Chicago, the railroad might seek an agreement with a railroad owning tracks from Memphis to St. Louis. Even if the tenant railroad acquired only bridge rights, it now could offer its New Orleans customers carriage to Chicago. The ICC refers to such long-distance freight that passes over the tracks from Memphis to St. Louis as "overhead traffic." Trackage rights agreements can also provide railroads with more efficient routes. If, for example, the railroad has

ant to 28 U.S.C. § 292(a).

been traveling from New Orleans to Memphis by way of Birmingham, Alabama, trackage rights agreements that allow the railroad to go from New Orleans to Jackson, Mississippi, and from Jackson to Memphis provide the railroad with a more direct route from New Orleans to Memphis.

The Interstate Commerce Act provides for ICC regulation of all trackage rights agreements. *See* 49 U.S.C. § 11343(a)(6). Under the Staggers Act of 1980, however, the ICC "shall exempt a person, class of persons, or a transaction or service" from regulation when the ICC finds that regulation "(1) is not necessary to carry out the transportation policy of [49 U.S.C. § 10101a]; [1] *and* (2) *either* (A) the transaction or service is of limited scope, *or* (B) [the regulation] is not needed to protect shippers from abuse of market power." *Id.* § 10505(a) (emphasis added). The ICC may revoke an exemption either in whole or in part if it subsequently determines regulation is again necessary under the same criteria. *Id.* § 10505(d).

The ICC granted the exemption for trackage rights agreement pursuant to

§ 10505. It concluded that neither extension nor bridge agreements needed regulation to carry out the rail transportation policy enumerated in 49 U.S. § 10101a or to protect shippers from abuse of market power, and that bridge agreements were limited in scope. The main thrust of the Commission's reasoning in support of these conclusions was that trackage rights agreements did not cause anticompetitive effects but indeed tended to enhance competition, when they affected it at all. *See* 1 I.C.C.2d at 276 (discussing rail transportation policy); *id.* at 278 (discussing the limited-scope and abuse-of-market power criteria). The Commission further reasoned that in the unlikely event that particular trackage rights agreements might cause some anticompetitive effects, they could be handled through exemption revocation proceedings under § 10505(d). *See* 1 I.C.C.2d at 281.

Various parties petitioned the ICC to reconsider its decision. The Commission denied their petitions, relying on the reasoning contained in its original decision. *See* Joint Appendix (J.A.) at 166. The petition-

---

**1.** 49 U.S.C. § 10101a, enacted as part of the Staggers Act of 1980, states:

In regulating the railroad industry, it is the policy of the United States Government—

(1) to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail;

(2) to minimize the need for Federal regulatory control over the rail transportation system and to require fair and expeditious regulatory decisions when regulation is required;

(3) to promote a safe and efficient rail transportation system by allowing rail carriers to earn adequate revenues, as determined by the Interstate Commerce Commission;

(4) to ensure the development and continuation of a sound rail transportation system with effective competition among rail carriers and with other modes, to meet the needs of the public and the national defense;

(5) to foster sound economic conditions in transportation and to ensure effective competition and coordination between rail carriers and other modes;

(6) to maintain reasonable rates where there is an absence of effective competition and where rail rates provide revenues which exceed the amount necessary to maintain the rail system and to attract capital;

(7) to reduce regulatory barriers to entry into and exit from the industry;

(8) to operate transportation facilities and equipment without detriment to the public health and safety;

(9) to cooperate with the States on transportation matters to assure that intrastate regulatory jurisdiction is exercised in accordance with the standards established in this subtitle;

(10) to encourage honest and efficient management of railroads and, in particular, the elimination of noncompensatory rates for rail transportation;

(11) to require rail carriers, to the maximum extent practicable, to rely on individual rate increases, and to limit the use of increases of general applicability;

(12) to encourage fair wages and safe and suitable working conditions in the railroad industry;

(13) to prohibit predatory pricing and practices, to avoid undue concentrations of market power and to prohibit unlawful discrimination;

(14) to ensure the availability of accurate cost information in regulatory proceedings, while minimizing the burden on rail carriers of developing and maintaining the capability of providing such information; and

(15) to encourage and promote energy conservation.

ers argue before this court that the decision to exempt trackage rights agreements from regulation was improper under the standards of § 10505(a) and that the ICC exceeded its statutory authority by relying on the availability of subsequent revocation proceedings under § 10505(d), when making its initial exemption decision under § 10505(a).

## II. ANALYSIS

The petitioners attack the ICC's determination that bridge agreements are "of limited scope" and that neither extension nor bridge agreements need regulation to protect shippers from abuse of market power. The petitioners do not bring an independent challenge under the rail transportation policy clause of § 10505(a). Rather, the petitioners contend only that "[i]f the Court should set aside the I.C.C.'s findings concerning 'market abuse,' the I.C.C.'s findings under the rail transportation policy should be set aside as well." *See* Brief of Petitioners at 30. Since we conclude that the ICC acted properly under the "abuse of market power" clause of the statute, by the terms of petitioners' own argument we have no occasion to question further the validity of the exemption under the rail transportation policy of clause § 10505(a).

█ Because we conclude that the ICC acted properly under the "abuse of market power" clause, we also need not address petitioners' "limited scope" challenge. The "limited scope" and "abuse of market power" requirements for an exemption are disjunctive: as long as the ICC properly concludes that regulation is unnecessary to protect shippers from abuse of market power, it need not find that the exempt transaction or service is "of limited scope." In this case, the Commission made clear that it would have granted the exemption even if it had not made its "limited scope" finding. 1 I.C.C.2d at 276–79. Thus, we proceed to address directly the petitioners' "abuse of market power" argument.

### A. *The Threat of Abandonment*

The petitioners contend that in exempting trackage rights agreements from regulation, the ICC did not give adequate consideration to the effect of a trackage rights agreement upon affected shippers who are located along lines that are not the subject of the specific agreement. A railroad that newly acquires the right to travel along a certain route may seek or threaten abandonment of its service along other routes that it has previously used. To return to our example from Part I, the railroad that acquires trackage rights from New Orleans to Memphis through Jackson may reconsider its service to shippers along the routes from New Orleans to Birmingham and Birmingham to Memphis. Or the railroad may have to raise its rates to shippers along these old routes, to make service to them economically viable. The petitioners characterize the potential of such railroad threats to abandon old routes unless the shippers along those routes pay higher rates as an "abuse of market power" and argue that regulation of trackage rights agreements is "needed to protect shippers from [that] abuse of market power."

But contrary to petitioners' characterization, the railroad behavior about which they complain is not "an abuse of market power." If a railroad acquires a more efficient route for its overhead traffic through a trackage rights agreement, the railroad's decision to divert its overhead traffic to the new route is a legitimate business decision to engage in the most profitable course of trade available. In making its exemption decision, the ICC referred to its "established principle that the routing of overhead traffic and the selection of alternative routes is a matter of railroad managerial discretion." 1 I.C.C.2d at 277. Even if the railroad then decided to stop serving customers along the old route unless they paid higher rates, that decision also would not be an abuse of market power. As the ICC stated, "local shippers who are unable to support a carrier cannot demand continued rail service simply because the line is used for movement of overhead traffic that could be handled over other routes." *Id.* Local shippers are understandably upset when their rail carrier finds that it is no longer worth continuing service to them at

current rates because it has found more lucrative alternatives routes. But this potential downside of trackage rights agreements to local shippers located along alternate routes stems from the economics of the marketplace and does not by itself make the acquisition of trackage rights or the threat of abandonment an "abuse of market power."

Thus, only if a railroad could somehow use a trackage rights agreement for one route to extort monopoly rates from the local shippers along a different route would trackage rights agreements pose a danger of market power abuse.[2] The ICC, however, determined that "the likelihood of market power abuses resulting from exempt agreements is remote." *Id.* at 281. Moreover, in the unlikely event that a railroad uses a trackage rights agreement to extract monopoly rates from local shippers on different routes, injured parties can seek relief from this abuse of market power in other ICC proceedings, according to the Commission. First, "shippers may properly raise the issue of improper diversion of overhead traffic at the time that a railroad seeks abandonment." 1 I.C.C.2d at 277. Second, "petitions to revoke exemptions under section 10505(d) may be filed at any time, and allegations of market power abuse and the need for regulation can be investigated before irreparable harm occurs." *Id.* at 281.

### B. *Reliance on Revocation Proceedings*

The petitioners have offered no evidence to contradict the ICC's assessment that the possibility of market power abuse through threatening economically unjustified abandonments in order to raise rates, as distinct from legitimate market-motivated abandonments, is remote. Rather, petitioners make the more formal legal argument that the ICC's reliance on its authority to subse-

quently revoke an exemption is improper when the Commission is deciding in the first place whether to grant the exemption at all.

■ We agree with petitioners that the criteria of § 10505(a) "must be satisfied *before the exemption is authorized.*" Brief of Petitioners at 31 (emphasis in original). If the ICC were to grant an exemption without determining that the regulation is not needed to carry out the rail transportation policy of § 10101a *and either* the exempt transaction is of limited scope *or* the regulation is not needed to protect shippers from abuse of market power, the ICC would stand in plain violation of its statutory authority under § 10505. The ICC may not refuse to make these determinations in the exemption proceedings, on the ground that it can handle these issues after-the-fact on a case-by-case basis in revocation proceedings. But the ICC did not take this unlawful course of conduct here. Rather, it determined that the chances of market power abuses arising from the exemption were remote and that it was not necessary to withhold the general exemption in order to protect shippers from this remote possibility; the rare cases of market power abuse could be remedied in subsequent proceedings.

■ We do not think § 10505 prohibits the ICC from granting a class-wide exemption when the vast majority of transactions will not result in market power abuse and the tiny minority that do may be challenged adequately in *post hoc* proceedings. *Cf. Brae Corp. v. United States,* 740 F.2d 1023, 1044 (D.C.Cir.1984) (holding that § 10505 authorizes classwide exemption of freight boxcar rates from regulation), *cert. denied,* 471 U.S. 1069, 105 S.Ct. 2149, 85 L.Ed.2d 505 (1985).[3] Indeed, the Conference Report to the Staggers Act stated:

---

**2.** In order for such a situation to be even imaginable, the railroad would already have to possess market power over the local shippers. But it would seem that a railroad's ability to abuse this market power does not depend on whether or not it acquires trackage rights over other routes. Nevertheless, perhaps there are circumstances in which trackage rights agreements can facilitate the abuse of market power.

**3.** Petitioners contend that the ICC's revocation procedures are inadequate to remedy any market power abuses that develop from trackage rights agreements because the exemption decision allows the trackage rights agreements to take effect without prior notice to the public and "markets can be unalterably changed by means of trackage rights" before challengers

The conferees anticipate that through the exemption process the Commission will eventually reduce its exercise of authority to circumstances where regulation is necessary to protect against abuse of market power where other federal remedies are inadequate for this purpose. Particularly, the conferees expect that as many as possible of the Commission's restrictions on changes in prices and services by rail carriers will be removed *and that the Commission will adopt a policy of reviewing carrier actions after the fact to correct abuses of market power.* H.R. Conf.Rep. No. 1430, 96th Cong., 2d Sess. 105 (1980), U.S.Code Cong. & Admin. News 1980, pp. 3978, 4137 (emphasis added). Thus, we conclude that the ICC's treatment of potential abandonment threats resulting from trackage rights agreements was proper under § 10505.[4]

### III. LABOR PROTECTION

One of the petitioners before this court, Patrick Simmons (the Illinois Legislative Director for the United Transportation Union), argues that the labor protection conditions imposed by the ICC in its exemption decision pursuant to § 10505(g)(2) were inadequate.

The ICC in this case imposed so-called *Mendocino Coast* labor protective conditions, which have been approved by this court in other similar cases involving trackage rights transactions. *See Railway Labor Executives Ass'n v. United States,* 675 F.2d 1248 (D.C.Cir.1982). In its petition for reconsideration before the Commission, the union argued that some particular trackage rights agreements subject to the exemption might require more labor protection than the *Mendocino Coast* conditions provide. The ICC responded, "If there is a need for additional labor protective conditions, the revocation process set forth in section 10505(d) provides a remedy." J.A. at 168.

Simmons now argues that the ICC may not rely on revocation proceedings to supplement the *Mendocino Coast* conditions originally provided. Rather, he contends, "[t]he level of protection is to be established by the agency before [exemption] decision becomes effective." Brief for Petitioners at 37. But this argument must fail.

■ If indeed the *Mendocino Coast* conditions are adequate for most trackage rights agreements but not for some, it is impossible for the ICC to set a single correct level of labor protection in the exemption decision. If Simmons is suggesting that the ICC must set in advance the most protective labor conditions that could possibly be required, we do not believe the statute requires the ICC to shape the exemption in advance to fit the most extreme scenario. Rather, the ICC can properly order in its exemption decision the level of labor protection that is appropriate for the majority of cases subject to the exemption, and can rely on its revocation authority to supplement these conditions when neces-

---

have the opportunity to seek an exemption revocation. Brief of Petitioners at 44. The ICC, however, flatly rejected the claim that trackage rights agreements can "unalterably" change markets: "Revoking an exemption would not be a meaningless exercise since trackage rights agreements are relatively easy to terminate." 1 I.C.C.2d at 281. The petitioners fail to direct us to any evidence in the administrative record that would undermine this determination and support their own contrary assertion. Consequently, we have no basis for rejecting the ICC's conclusion that in revocation or abandonment proceedings "the need for regulation can be investigated before irreparable harm occurs."

**4.** Petitioners attempt to rely on a previous case involving the same parties, *Illinois Commerce Comm. v. ICC,* 787 F.2d 616 (D.C.Cir.1986), which they contend involved "the same over-

head diversion matter." Brief of Petitioners at 29. But *Illinois I* does not dictate the result of this case. In *Illinois I,* we held that "the Commission ha[d] failed to articulate a reasoned explanation for" its decision to exempt from regulation abandonments of lines that had been used only for overhead traffic. By contrast, this case involves the effect on local shippers along an existing line from the acquisition of trackage rights on other lines. *Illinois I* establishes that we must ask whether the ICC had a "reasoned explanation" for the exemption decision, but it cannot answer this question for any given case. In this case, we have concluded that the Commission reasonably explained why regulation of trackage rights agreements was unnecessary to protect local shippers on other lines from abuses of market power.

sary.[5] Simmons has not offered us any indication of what percentage of trackage rights agreements would require more labor protection than the *Mendocino Coast* conditions. Therefore, we must conclude that the ICC's decision to set the *Mendocino Coast* conditions as the rule was not unreasonable.

### CONCLUSION

Under the precedents of this circuit, we will uphold an ICC decision under § 10505(a) if the ICC has articulated "a reasoned explanation for its action." *See Illinois Commerce Commission v. ICC,* 787 F.2d 616, 626 (D.C.Cir.1986); *Brae*

*Corp. v. United States,* 740 F.2d 1023, 1038 (D.C.Cir.1984), *cert. denied,* 471 U.S. 1069, 105 S.Ct. 2149, 85 L.Ed.2d 505 (1985). Because the ICC's decision to exempt trackage rights agreements from regulation withstands scrutiny under this standard of review, the petition in this case is hereby

*Denied.*

---

**5.** Reliance on the revocation authority of § 10505(d) to modify labor protective conditions, of course, does not require the ICC to amend any other aspect of the initial exemption decision.