841 F.2d 1162
 268 U.S.App.D.C. 337
 STATE OF WEST VIRGINIA, ex rel. A. James MANCHIN, Treasurer
of State, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Chesapeake and Ohio Railway Co., Intervenor.
 No. 87-1244.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 26, 1988.
Decided March 22, 1988.
 
 J. Bradley Russell, Sr. Asst. Atty. Gen., State of W. Va., Charleston, W. Va., for petitioner.
 Michael Martin, Atty., I.C.C., with whom Robert S. Burk, Gen. Counsel, Ellen D. Hanson, Associate Gen. Counsel, I.C.C., John J. Powers III and David Seidman, Attys., Dept. of Justice, Washington, D.C., were on the brief for respondents.
 Lawrence H. Richmond and Peter J. Shudtz, Baltimore, Md., were on the brief for intervenor, Chesapeake and Ohio Ry. Co.
 Before WALD, Chief Judge, and SILBERMAN and BUCKLEY, Circuit Judges.
 Opinion Per Curiam.
 
 PER CURIAM:
 
 1
 In this case we review the decision of the Interstate Commerce Commission ("ICC" or "Commission") exempting from its full regulatory review a request by the Baltimore and Ohio Railroad ("CSX") to abandon a 60.57 mile segment of track between Walker and Wilsonburg, West Virginia. The Walker-Wilsonburg segment was at one time part of an important east-west main line with a history stretching back to before the Civil War. Despite its past, the line has recently fallen into disuse, primarily because nine tunnels on the line are too low to accommodate the larger boxcars now in favor with the railroad and its shippers. Consequently, CSX has rerouted all east-west through traffic formerly carried by this line to another line capable of handling taller boxcars. Moreover, within the past three years, no local revenue traffic has originated or terminated on the line.
 
 
 2
 The ICC originally granted CSX's request for an exemption in December 1986, but later granted the State of West Virginia's petition for reconsideration and stayed its prior decision. In April 1987, after receiving numerous submissions opposing the exemption and a response from CSX, the ICC reaffirmed its original decision granting the exemption.[1] West Virginia then petitioned this court for review. We review the Commission's action here to see if it was arbitrary and capricious, an abuse of discretion, or otherwise contrary to law. See 5 U.S.C. Sec. 706 (1982); Brae Corp. v. United States, 740 F.2d 1023, 1038 (D.C.Cir.1984), cert. denied, 471 U.S. 1069, 105 S.Ct. 2149, 85 L.Ed.2d 505 (1985). As we find the Commission's decision reasonable and not contrary to law, we affirm.
 
 
 3
 A rail carrier may not generally be relieved of its obligation to offer, and upon request provide, service over any of its lines without first obtaining permission from the ICC pursuant to 49 U.S.C. Secs. 10903-10906 (1982). Prior to permitting the abandonment, the Commission must find that "the present or future public convenience and necessity require or permit the abandonment." 49 U.S.C. Sec. 10903(a). In making this determination, the Commission is required to "consider whether the abandonment or discontinuance will have a serious, adverse impact on rural and community development." Id. Under 49 U.S.C. Sec. 10505, however, the Commission is directed to exempt a transaction from regulation when it finds that (1) its regulation is not necessary to carry out the rail transportation policy (as set out in 49 U.S.C. Sec. 1010a) and (2) either the transaction is of limited scope, or regulation is not needed to protect shippers from abuse of market power. See CMC Real Estate Corp. v. ICC, 807 F.2d 1025, 1031 (D.C.Cir.1986) (exemption provision an "important cornerstone" of new flexible approach to regulating rail industry).
 
 
 4
 The Commission determined that exempting CSX's abandonment application from full regulatory review would further the rail transportation policy by expediting the regulatory process, reducing regulatory barriers to exit, ensuring sound economic conditions, and promoting an efficient rail transportation system. See 49 U.S.C. Sec. 10101a(2), (7), (5), and (10). The Commission also found that full regulatory proceedings were not needed to protect shippers from abuse of market power, because no local shippers had used the line in recent years and the line carried no through traffic.
 
 
 5
 We consider here two objections West Virginia has raised to the ICC decision. First, West Virginia points out that in the past three years rates charged to local coal shippers along the line jumped from $3.00 per ton to $6.18 per ton and claims these higher rates made local coal shippers uncompetitive. West Virginia suggests the railroad's purpose in raising rates was to dry up local traffic on the line so as to take advantage of the exemption provision. In its discussion of this issue, the ICC noted that under the Staggers Act of 1980, railroads have a great deal of ratemaking flexibility and that raising rates to a level where local shippers stop shipping is not necessarily improper. See Illinois Commerce Comm'n v. ICC, 819 F.2d 311, 314-15 (D.C.Cir.1987). Furthermore, the ICC did not receive challenges to the higher rates from any shippers. Based on the absence of rate challenges and the new deregulatory environment which encourages compensatory rates, it was not arbitrary and capricious for the ICC to determine that the increase in rates was not improper or part of a larger scheme to impermissibly circumvent abandonment regulations.
 
 
 6
 West Virginia also argues that the ICC should have held a hearing to determine whether the exemption conflicted with 49 U.S.C. Sec. 10101a(4) which states that it shall be part of the rail transportation policy "to ensure the development and continuation of a sound rail transportation system." (emphasis added). West Virginia contends this policy goal is particularly implicated by the abandonment of a line located in a coal region. The ICC, however, found that where no local traffic had originated on the line for over three years, it was highly speculative whether local traffic would ever support maintenance of the line. The Commission did consider and discuss the abandonment's effect on rural and community development, as it would have been required to do under Sec. 10903(a), but found that "[t]here is simply no assurance that, if the line were kept intact, enough need for rail service from the area involved would develop to make the line profitable." ICC Order, slip op. at 7. Where none but speculative suggestions for future use had been presented to it, the Commission's judgment that no hearing was required to further explore this issue was reasonable. See CMC Real Estate Corp., 807 F.2d at 1031-32 (Staggers Act eliminated requirement that Commission afford a hearing prior to approving an exemption). Even under the full procedure set out at 49 U.S.C. Secs. 10903-10906, a hearing is not obligatory. See 49 U.S.C. Sec. 10904(c)(1); Illinois v. ICC, 709 F.2d 1186, 1191 (7th Cir.1983). And the substantive determination not to force the railroad to keep its investment in a non-profitable asset on the possibility that the price of coal might go back up or that other local industries might develop is not arbitrary and capricious.[2] We have considered the other arguments raised by West Virginia, but we do not find them persuasive. We therefore affirm the Commission.
 
 
 
 [1]
 Baltimore and Ohio Railroad Company--Abandonment Exemption--Harrison, Doddridge, Ritchie and Wood Counties, W.V., ICC Docket No. AB-19 (Sub-No. 125X), (April 17, 1987), reprinted in J.A. at 253-262 ("ICC Order")
 
 
 [2]
 The Commission did modify its grant of the exemption to require CSX to sell the line pursuant to 49 U.S.C. Sec. 10905 to any financially responsible party who would provide future rail service on the line. The Treasurer of the State of West Virginia has formally expressed interest in buying the line, and we are informed that the financial assistance purchase phase of the proceeding is still pending. Thus if West Virginia continues to believe that abandonment is a mistake, it could purchase the line itself