**M.M. WINTER, Petitioner,**

v.

**INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents.**

No. 88–1250.

United States Court of Appeals,
Eighth Circuit.

Submitted May 11, 1988.

Decided July 12, 1988.

Gordon P. MacDougall, Washington, D.C., for petitioner.

Richard Edelman, Washington, D.C., for intervenor.

Charles Alan Stark, Washington, D.C., for respondents.

Betty Jo Christian, Washington, D.C., for intervenor.

Before FAGG, WOLLMAN, and BEAM, Circuit Judges.

WOLLMAN, Circuit Judge.

M.M. Winter, General Chairman of the United Transportation Union (UTU), filed this petition for judicial review of an Interstate Commerce Commission (Commission) decision denying his petition [1] to reject Winona Bridge Railway Company's (Winona Bridge) exemption from the regulatory requirements of the Interstate Commerce Act, 49 U.S.C. § 11343(a)(6),[2] with respect to Winona Bridge's acquisition of trackage rights over Burlington Northern Railroad Company's (BN) line.[3] *See Winona Bridge Railway Company—Trackage Rights—Burlington Northern Railroad Company,* (the *January 7 Decision* ), Finance Docket No. 31163 (Jan. 7, 1988), *petitions to reopen filed,* January 19 and 27, 1988. After the Commission moved to dismiss Winter's petition for lack of a reviewable order, we granted Winter's request for a temporary stay of the *January 7 Decision* and ordered expedited briefing on all issues concerning the stay, the pending motion to dismiss, and the underlying merits of the action. Because we conclude that the *January 7 Decision* is not a final order, we dismiss the appeal and vacate the stay. We also decline to invoke our authority under the All Writs Act, 28 U.S.C. § 1651 to issue a writ compelling the Commission to reject the exemption.

---

1. Two other labor unions, the Railway Labor Executives' Association (RLEA) and the Brotherhood of Locomotive Engineers, also challenged the exemption.

2. 49 U.S.C. § 11343(a)(6) provides:

    (a) The following transactions involving carriers providing transportation subject to the jurisdiction of the Interstate Commerce Commission under subchapter I (except a pipeline carrier), II, or III of chapter 105 of this title may be carried out only with the approval and authorization of the Commission:

    \* \* \* \* \* \*

    (6) acquisition by a rail carrier of trackage rights over, or joint ownership in or joint use of, a railroad line (and terminals incidental to it) owned or operated by another rail carrier.

3. Winona Bridge and BN (jointly railroad intervenors) intervened in defense of the Commission's position. The RLEA intervened on behalf of Winter.

## I. BACKGROUND

Winona Bridge, a wholly-owned subsidiary of BN, owns a railroad bridge across the Mississippi River between Winona, Minnesota, and E. Winona, Wisconsin. The 1.07 mile-long bridge has been out of service since September 1985. On November 16, 1987, Winona Bridge and BN entered into an agreement in which BN granted Winona Bridge trackage rights [4] over BN's Northern line between Winona Junction, Wisconsin, and Seattle, Washington, a distance of approximately 1,860 miles. BN entered into this agreement in an effort to compete with trucking companies that provide low-cost services for long-distance transportation. Originally, BN had planned to implement "Expeditor service" employing one engineer and one conductor on its Northern line from St. Paul, Minnesota, to Seattle, Washington. Because BN's negotiations with the UTU for reduced crew size were unsuccessful, BN decided to use its subsidiary, Winona Bridge, to operate over the Northern line with two-man crews. In the planned transaction, Winona Bridge would hire new employees not subject to BN's labor agreements. BN informed its employees that if the unions would agree to reduced crew size, Winona Bridge would not begin operations. BN granted Winona Bridge the right to pick up and set out traffic at BN's intermodal hub centers in St. Paul, Spokane, and Seattle, which will enable BN to compete with motor carriers for trailer-on-flat-car and container-on-flat-car traffic.

Under the Interstate Commerce Act, the Commission must regulate all trackage rights agreements. *See* 49 U.S.C. § 11343(a)(6). More recently, however, in light of the severe financial crisis facing the nation's rail industry, Congress realized that extensive regulation was prohibiting railroads from becoming economically viable. In 1980, Congress enacted the Staggers Act, which directs the Commission to exempt from regulation all transactions that it finds do not require regulation to carry out the national transportation policy and are either of limited scope or involve situations in which regulation is not needed to protect shippers from the abuse of market power. *See* 49 U.S.C. § 10505(a); [5] *see also Winter v. ICC,* 828 F.2d 1320, 1321 (8th Cir.1987). Through the Staggers Act, Congress intended to liberalize the regulatory framework that the Interstate Commerce Act imposed on the railroad industry. Congress hoped that an improved regulatory climate would "increase the rail industry's productivity and enhance financial returns sufficiently to encourage an infusion of private capital into the industry" to prevent the collapse of the nation's rail industry. *Simmons v. ICC,* 697 F.2d 326, 328 (D.C.Cir.1982). The Commission was charged with responsibility for actively pursuing exemptions for transportation and services that would allow competition and would minimize the need for regula-

---

**4.** There are two basic types of trackage rights agreements. In so-called "bridge" trackage rights agreements, the owner railroad permits the tenant railroad to use its tracks from one point to another, but withholds permission to serve customers along the route. This allows the tenant carrier to create new routes for long-distance customers. In "extension" trackage rights agreements, the tenant railroad is allowed to serve freight customers along the line. *Illinois Commerce Commission v. ICC,* 819 F.2d 311, 312 (D.C.Cir.1987).

**5.** 49 U.S.C. § 10505 provides in pertinent part:
Authority to exempt rail carrier transportation
(a) In a matter related to a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under this subchapter, the Commission

shall exempt a person, class of persons, or a transaction or service when the Commission finds that the application of a provision of this subtitle—
(1) is not necessary to carry out the transportation policy of section 10101a of this title; and
(2) either (A) the transaction or service is of limited scope, or (B) the application of a provision of this subtitle is not needed to protect shippers from the abuse of market power.

\* \* \* \* \* \*

(d) The Commission may revoke an exemption, to the extent it specifies, when it finds that application of a provision of this subtitle to the person, class, or transportation is necessary to carry out the transportation policy of section 10101a of this title.

tory control over the rail industry. *American Trucking Ass'ns, Inc. v. ICC*, 656 F.2d 1115, 1119 (5th Cir.1981); *see also* H.R. Rep. No. 1035, 96 Cong., 2d Sess. 60, *reprinted in* 1980 U.S.Code Cong. & Admin. News 3978, 4005.

Following this congressional mandate, the Commission determined that certain trackage rights agreements between rail carriers, as a class, should be exempt from regulation. *Railroad Consolidation Procedures—Trackage Rights Exemption*, Ex Parte No. 282 (Sub–No. 9), 1 I.C.C.2d 270 (1985), *aff'd sub nom. Illinois Commerce Commission v. ICC*, 819 F.2d 311 (D.C.Cir. 1987). The Commission concluded:

> [T]rackage rights based on written agreements and not filed as responsive applications to rail consolidation proceedings should be exempted from regulation. Transactions that permit only bridge rights will maintain the competitive balance among carriers, preserve shippers' existing transportation choices, give shippers access to alternative routes with shorter, faster, or otherwise improved routing and increase the operational efficiency of the participating carriers. Improving operating efficiencies will help ensure the continued development of sound rail transportation systems, foster sound economic conditions, encourage efficient management, and promote energy conservation.

*Id.* at 275–76; *see also* 49 C.F.R. § 1180.2(d)(7) (1987).

The trackage rights class exemption allows a transaction between two rail carriers to be consummated seven days after the railroad files a notice with the Commission. 49 C.F.R. § 1180.4(g)(1). If the notice contains false or misleading information, the Commission may summarily revoke it. *Id.* at § 1180.4(g)(1)(ii). The Commission must publish a summary of the transaction in the *Federal Register* within twenty days of filing. *Id.* at § 1180.4(g)(2)(ii). The procedural mechanism for other interested parties to challenge exempt trackage rights agreements is a petition to revoke under 49 U.S.C. § 10505(d). *Id.* The filing of such a peti-

tion does not stay the effectiveness of an exemption. Rather, the Commission will review carrier actions after the fact to correct abuses of market power. *American Trucking Ass'ns, Inc. v. ICC*, 656 F.2d at 1120 (quoting H.R.Rep. No. 1430, 96 Cong., 2d Sess. 105, *reprinted in* 1980 U.S.Code Cong. & Admin.News 4110, 4137).

All trackage rights exemptions are subject to the standard employee protective conditions. These so-called *Mendocino Coast* labor protective conditions protect employees adversely affected by a grant of trackage rights for up to six years. *See Mendocino Coast Ry.—Lease and Operate—California W. R.R.*, 360 I.C.C. 653 (1980), *aff'd sub nom., RLEA v. United States*, 675 F.2d 1248 (D.C.Cir.1982).

Winona Bridge filed its notice of exemption with the Commission on November 18, 1987. On November 25, 1987, the RLEA filed a petition to void, revoke or stay the exemption on the ground that the application of the Interstate Commerce Act was necessary to carry out the national transportation policy and that the notice contained misleading information. Specifically, the RLEA argued that fair wages and safe and suitable working conditions are a national transportation goal, *see* 49 U.S.C. § 10101a(12), and that the purpose of Winona Bridge's trackage rights agreement was to circumvent labor agreements. The RLEA argued that the exemption was void on its face because it contained misleading information in that the purpose of the agreement was to evade the provisions of the Railway Labor Act and to pay lower wages and provide less beneficial working conditions to employees.

The Commission published notice of the exemption on November 25, 1987, continuing the transaction in force subject to the *Mendocino* labor conditions. On December 2, 1987, Winter filed a petition to reject and/or revoke the exemption. Winter argued that Winona Bridge was not a carrier and thus could not invoke the trackage rights class exemption from 49 U.S.C. § 11343(a)(6), which regulates transactions between two carriers. Although acknowledging that previous Commission cases re-

ferred to Winona Bridge as a carrier, Winter argued that a "rail carrier" for purposes of the exemption is "a person providing railroad transportation for compensation," 49 U.S.C. § 10102(20), and that Winona Bridge was currently an out-of-service railroad bridge.

On January 7, 1988, the Commission issued its 3–2 decision denying the petitions to reject Winona Bridge's notice of exemption. The Commission deferred ruling on the petitions to revoke. Reasoning that the class exemption regulations do not require an explanation of the railroad carrier's underlying motivations for entering into a trackage rights agreement, the Commission disagreed with the RLEA's contention that the notice was misleading. It also disagreed with Winter's contention that Winona Bridge was not a carrier within the meaning of section 11343(a)(6), noting that the RLEA had characterized Winona Bridge as a switching carrier and that previous Commission decisions had considered Winona Bridge a carrier. The Commission stated that merely because Winona Bridge does not perform, and may never have performed, its own transportation services is not determinative of its common carrier status and that Winona Bridge could be found to have a residual common carrier obligation. The Commission concluded that Winter had "not presented any evidence to permit [it] to resolve definitively the status of [Winona Bridge] in this decision," and that Winter and the RLEA had "failed to establish a basis for rejecting or otherwise finding [Winona Bridge's] notice of exemption void *ab initio*." Mem. op. at 3.

Two commissioners dissented from the majority opinion. Vice-chairman Lamboley stated that he would stay the operation of the exemption. He found that the majority's findings concerning Winona Bridge's carrier status were "superficial at best" and that the issues needed to be addressed in greater detail. He relied on the stan-

dards for measuring carrier status outlined in *Brotherhood of Locomotive Engineers v. Interstate R.R. Co., et al.*, Finance Docket No. 31078 (Nov. 27, 1987). Relevant factors are whether an entity holds itself out as a common carrier for hire as shown by tariff publication, actual movement of traffic, and whether it has the ability to so perform. In applying the *Interstate* standards to Winona Bridge, Commissioner Lamboley noted that no traffic had moved over Winona Bridge since 1985 when the bridge closed and that Winona Bridge has no rail service employees. There are no tariffs on file, and there is some question whether operations over the bridge could safely resume. He thus concluded that the Commission should stay the exemption and ask the parties to address the matter further. Commissioner Simmons also suggested that the Commission should have stayed the transaction and set the proceeding for notice and comment. Neither of the dissenting commissioners stated, however, that Winona Bridge's status was so clear that the Commission could reject the exemption without further proceedings.

Both Winter and the RLEA filed petitions to reopen the *January 7 Decision*. See 49 U.S.C. § 10327(g)(1); 49 C.F.R. § 1115.3 (1987). The Commission denied the unions' subsequent request for a stay.[6] The Commission has not yet decided the petitions to reopen and has not ruled on the revocation requests filed earlier.

## II. DISCUSSION

Winter argues that the Commission's decision not to reject Winona Bridge's notice of exemption should be set aside as arbitrary and capricious and in excess of statutory jurisdiction. See 5 U.S.C. § 706(2)(A), (C). To address this contention, however, we must first determine whether the *January 7 Decision* is a reviewable order. We have jurisdiction to review only final orders of the Commission. 28 U.S.C. § 2344. Cit-

---

**6.** In related proceedings, on March 29, 1988, BN filed an action in the United States District Court for the Northern District of Illinois seeking to enjoin a potential labor strike resulting from the trackage rights agreement exemption.

See *Burlington Northern R.R. Co. v. United Transp. Union*, No. 88–C–2687. UTU filed a counterclaim alleging that consummation of the transaction would violate the Railway Labor Act.

ing *ICC v. Brotherhood of Locomotive Engineers,* — U.S. —, 107 S.Ct. 2360, 96 L.Ed.2d 222 (1987), Winter argues that the *January 7 Decision* is reviewable and that the pending petitions to reopen and for revocation do not impair its finality. Interestingly, the Commission cites the same case for the opposite proposition. We agree with the Commission's interpretation.

In *Brotherhood of Locomotive Engineers,* the Court analyzed the finality of Commission decisions in various circumstances. Under the first scenario, if the Commission *grants* a petition for reconsideration of an original order and issues a new order, the new order is the reviewable final order. This is so even if the new order merely reaffirms the rights and obligations of the original order. *Id.* 107 S.Ct. at 2365.

Second, when the Commission *denies* a timely petition for reconsideration alleging material error, the "petition tolls the period for judicial review of the original order, which can therefore be appealed to the courts *directly* after the petition for reconsideration has been denied." *Id.* at 2366. For example, in *Brotherhood of Locomotive Engineers,* the Commission issued an order granting two railroad companies the right to use the tracks of a third carrier. Subsequently, a union filed a petition for clarification of the order, contending that the Commission's approval of the trackage rights agreement did not authorize the tenant railroads to use their own crews. The Commission held that its order was unambiguous and denied the union's petition. The union then filed a petition for reconsideration on the ground that the tenant railroad's crewing procedures violated employee protections. After the Commission denied that petition, the union sought judicial review. The Court determined that neither the order denying the petition for clarification nor the order denying the petition for reconsideration based on material

error was reviewable. The union should have appealed the original order after its subsequent petitions were denied.

A third situation involves the status of an original order during the time period after a petition for reconsideration has been filed, but before the Commission has acted upon it. That is the situation in this case. Relying on the Administrative Procedure Act, 5 U.S.C. § 704, Winter and the RLEA argue that although a petition for reconsideration will toll the time period within which a party must file a petition for review, it does not bar judicial review of the original order.

The Court discussed finality in the context of whether an appeal was timely filed. Because an appeal must be filed within sixty days of a final order, the Court was required to determine when a Commission order becomes final for purposes of starting the running of the limitation period. The Court analyzed the language of the Administrative Procedure Act, 5 U.S.C. § 704, which provides in pertinent part:

> Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is operative, for an appeal to superior agency authority.

The Court acknowledged that the above-quoted language would seem to suggest that the pendency of motions for reconsideration do not impair the finality of Commission orders.[7] Courts, however, have long construed the language of the Administrative Procedure Act as merely relieving parties from the requirement of petitioning for rehearing before seeking judicial review, unless specifically required to do so by statute. *Id.* at 2369. The Court cited with approval various cases holding that

---

7. Similarly, 49 U.S.C. § 10327(i) provides that "'[n]otwithstanding' the provision authorizing the Commission to reopen and reconsider its orders (§ 10327(g)), 'an action of the Commission ... is final on the date on which it is served, and a civil action to enforce, enjoin, suspend, or set aside the action may be filed after that date.'" *Brotherhood of Locomotive Engineers,* 107 S.Ct. at 2368–69 (quoting 49 U.S.C. § 10327(i)).

petitions that are actually filed render the orders under reconsideration nonfinal. For instance, in *Outland v. CAB*, 284 F.2d 224 (D.C.Cir.1960), the court observed:

> Where a motion for rehearing is in fact filed there is no final action until the rehearing is denied * * *. [W]hen the party elects to seek a rehearing there is always a possibility that the order complained of will be modified in a way which renders judicial review unnecessary. Practical considerations, therefore, dictate that when a petition for rehearing is filed, review may properly be deferred until this has been acted upon.

*Id.* at 227–28; *see also American Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 541, 90 S.Ct. 1288, 1293–94, 25 L.Ed.2d 547 (1970) (where motion for rehearing is filed there is no final action until rehearing is denied); *CAB v. Delta Airlines, Inc.*, 367 U.S. 316, 326, 81 S.Ct. 1611, 1619, 6 L.Ed.2d 869 (1961) (administrative order is not final for purposes of judicial review until agency has disposed of outstanding petitions for reconsideration).

▆▆ Winter correctly notes that in multi-party proceedings one party may seek judicial review of an agency decision while another party seeks administrative reconsideration, resulting in both tribunals having jurisdiction. An agency decision may thus be final for one purpose yet nonfinal for another purpose. However, no cases hold that the same party may simultaneously seek both judicial and administrative review. We are convinced that under the circumstances of this case *Brotherhood of Locomotive Engineers* stands for the proposition that once the unions filed petitions to reopen and to revoke the exemption, the original *January 7 Decision* became nonfinal.

The railroad intervenors argue that the case most pertinent to the jurisdictional issue before the court is *Papago Tribal Utility Auth. v. FERC*, 628 F.2d 235 (D.C. Cir.), *cert. denied,* 449 U.S. 1061, 101 S.Ct. 784, 66 L.Ed.2d 604 (1980). In *Papago,* the District of Columbia Circuit held that an order of the Federal Energy Regulatory Commission denying a customer's motion to reject a rate filing on the ground of patent defects was not reviewable. *Id.* at 241. The court noted that generally an order is final if it " 'imposes an obligation, denies a right, or fixes some legal obligation as a consummation of the administration process.' " *Id.* at 239 (quoting *Cities Service Gas Co. v. FPC*, 255 F.2d 860, 863 (10th Cir.), *cert. denied,* 358 U.S. 837, 79 S.Ct. 61, 3 L.Ed.2d 73 (1958)). The decision to accept a filing, however, merely initiates the administrative process. It is analogous to denying a motion to dismiss. It decides nothing about the merits of the case, is quickly made without time for considered judgments on the law or the facts, and gives the reviewing court no factual record to examine. Judicial intervention would be cumbersome and inappropriate because a court would act with little factual basis and without the benefit of the Commission's views on relevant question of law and regulatory policy. Thus, the court concluded that the initial decision not to reject a rate filing was not reviewable.

Winter and the RLEA offer several reasons why *Papago* is not dispositive of this case. Winter first argues that *Papago* was a rate case, and the court relied upon a specific statutory directive that agency decisions whether to suspend or investigate rates are not reviewable. The railroad intervenors correctly note, however, that the court specifically stated that its conclusion did not depend on statutory language. The RLEA argues that the statutory scheme in this case is distinguishable from the one in *Papago* because under the Staggers Act a transaction that is exempted from prior Commission approval may be implemented within seven days, whereas under the Federal Power Act customers are protected by a five-month suspension period.

Although the two statutory schemes are not identical, we are satisfied that they are analogous and that *Papago* is dispositive of this case. We realize that if we dismiss this appeal for lack of a final order, the trackage rights agreement will go into effect before either the Commission or a court will have made a comprehensive analysis of whether Winona Bridge is a

carrier entitled to evoke the trackage rights agreement exemption. Allowing this transaction to go forward in light of the possibility that the Commission will ultimately revoke the exemption for lack of jurisdiction will no doubt burden railroad employees. Nevertheless, we are bound by the doctrine of finality and the statutory scheme of the Staggers Act, which provides for challenges to the Commission's actions through revocation proceedings after the transaction has been consummated.

The RLEA next argues that although both *Papago* and this case involve challenges to an agency's threshold acceptance of a filing, the two cases are fundamentally different because in *Papago* the request for rejection of a filing was based essentially on substantive challenges to the action, whereas in this case the challenge is on jurisdictional grounds, i.e., whether the railroad intervenors are allowed to utilize the class exemption procedures. They point out that in *Papago,* the court specifically noted that a rate filing clearly outside the bounds of an agency's statutory authority is immediately reviewable. *Papago Tribal Utility Auth. v. FERC,* 628 F.2d at 243 n. 20.

▮ Although we agree with the RLEA that cases in which there is a clear jurisdictional defect constitute an exception to the final order requirement, that exception is not applicable here.[8] Cases in which there is a clear jurisdictional defect are distinguishable from cases, such as this one, that give rise only to clear jurisdictional disputes. *Marine Wonderland Animal Park, Ltd. v. Kreps,* 610 F.2d 947, 950 (D.C.Cir.1979). When jurisdiction is merely in dispute, however, the agency should be allowed to make the initial determination of its jurisdiction. *Id.* Here, the jurisdictional dispute concerns Winona Bridge's status as a rail carrier within the meaning of section 11343. The Commission refused to summarily revoke the notice as void on its face because it believed that it did not have sufficient information before it to establish that Winona Bridge was not a carrier subject to its jurisdiction. The Commission must be given the opportunity to make this determination in the pending revocation proceeding. We therefore do not accept Winter's assertion that by dividing its decision into a rejection phase and a revocation phase, the Commission made a final decision that it had jurisdiction.

We also do not believe that allowing the transaction to go forward will irreparably harm union members. Under the labor protections imposed by the Commission, BN employees adversely affected by the transaction will maintain their current salary and benefits for a period of six years. Although the unions argue that BN employees who have been laid off will lose their seniority with BN if they accept jobs with Winona Bridge, these employees are not compelled to begin new jobs with Winona Bridge as a result of the consummation of the transaction. Rather, employees have a choice to accept or reject the offer of employment.

As an alternative theory, the RLEA argues that under *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), this case is ripe for judicial review. In *Abbott Laboratories,* drug manufacturers challenged a regulation requiring them to indicate the established name of a drug every time its proprietary name was employed. Although the new regulation had not yet been enforced against anyone, the Court determined that the controversy was ripe for judicial review because the case involved a purely legal question of statutory construction and no further administrative proceedings were contemplated. Additionally, viewing the issue of finality in a pragmatic way, the Court concluded that the formal promulgation of the regulation constituted final agency action. The regulations gave an authoritative interpretation of a statutory provision and had a direct and immediate impact on all prescription drug companies, requiring them to change all their

---

**8.** Winter contends that because the *January 7 Decision* is a final order, exceptions to the final order doctrine need not be discussed.

labels and advertisements or risk prosecution.

■ The RLEA argues that in this case the question whether Winona Bridge is a "carrier" entitled to use the exemption is a legal determination. It argues that although petitions to reopen are pending and the Commission may revoke the exemption, because the effect of the Commission's refusal to reject the exemption is to allow the railroad companies to consummate the trackage rights agreement the decision constitutes a final agency action. We cannot agree.

This case is distinguishable from *Abbott Laboratories*. There, further administrative proceedings were not contemplated, whereas in this case the unions may ultimately receive the relief they seek in subsequent Commission action. More importantly, as we have already indicated, the revocation provisions of the Staggers Act contemplate that the Commission will review exempt transactions after they are consummated. We would violate the statutory scheme if we were to intrude into the administrative process at this point.

Accordingly, we hold that the *January 7 Decision* is not a final order and that we have no appellate jurisdiction.

Likewise, we conclude that this case does not warrant the invocation of our power under the All Writs Act, 28 U.S.C. § 1651.

■ The fact that a nonappealable order is possibly erroneous on a jurisdictional question is not grounds for granting the extraordinary remedy of a writ. *In re State of South Dakota*, 692 F.2d 1158, 1160 (8th Cir.1982). Jurisdiction must be clearly lacking to justify issuance of a writ.

> The challenged assumption or denial of jurisdiction must be so plainly wrong as to indicate failure to comprehend or refusal to be guided by unambiguous provisions of a statute or settled common law doctrine. If a rational and substantial legal argument can be made in support of the questioned jurisdictional ruling, the case is not appropriate for mandamus or prohibition even though on normal

appeal a reviewing court might find reversible error.

*Id.* at 1161 (quoting *American Airlines, Inc. v. Forman*, 204 F.2d 230, 232 (3d Cir.), *cert. denied*, 346 U.S. 806, 74 S.Ct. 54, 98 L.Ed. 336 (1953)).

The Commission's decision not to reject the exemption on the ground that Winona Bridge was not a carrier under 49 U.S.C. § 11343 was not so plainly wrong that it indicates that the Commission did not understand an unambiguous statutory provision. Prior decisions discussing Winona Bridge's status were contradictory, and the Commission did not have the benefit of a well-developed factual record before it when it made its initial decision. Additionally, neither of the dissenting commissioners concluded that the lack of jurisdiction was so clear that the notice of exemption should be rejected. Rather, they argued that the issues needed further development. We therefore conclude that the Commission's action does not constitute a clear abuse of discretion or usurpation of power.

The writ is denied, and the appeal is dismissed for lack of jurisdiction.

FAGG, Circuit Judge, dissenting.

In this case Winona Bridge is an imposter. It is inescapably clear from the information presented to the Commission, *see ante* at 1060, that Winona Bridge is not a rail carrier—it is nothing more than the owner of a defunct railroad river bridge. For this reason it will be impossible for Winona Bridge, without carrier status, to "invoke the trackage rights class exemption from 49 U.S.C. § 11343(a)(6), which regulates transactions between two carriers." *Ante* at 1059.

In my view, it is farcical to permit the trackage rights agreement to go forward on the strength of the Commission's mischievous "belie[f] that it did not have sufficient information before it to establish that Winona Bridge was not a carrier subject to its jurisdiction." *Ante* at 1063. The exact contours of rail carrier status are no doubt open to interpretation. Even so, unless those contours are gerrymandered by the

Commission, Winona Bridge will not qualify.

It is one thing for Congress "to liberalize the regulatory framework," *ante* at 1058, and to permit the Commission to exempt trackage rights agreements between rail carriers. It is an entirely different matter, however, for the Commission to countenance the charade at hand. There is a clear jurisdictional defect here. In this circumstance, the court should not turn Winter away empty-handed, particularly when it recognizes that "lack of jurisdiction will no doubt burden railroad employees." *Ante* at 1063.

Whatever else Winona Bridge may be it is not a rail carrier, and to treat it as one is a distortion of the regulatory process. Thus, I dissent.